# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PARKCREST BUILDERS, LLC** | **CIVIL ACTION** |
| **VERSUS** | **No. 15-1533**<br>**c/w 16-14118 and 16-15849** |
| **HOUSING AUTHORITY OF NEW ORLEANS** | **SECTION "J"(4)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This litigation arises out of a dispute over the construction of the Florida Avenue: New Affordable Housing Units in New Orleans, Louisiana (the "Project"). On March 4, 2013, the Housing Authority of New Orleans ("HANO"), the Project owner, initially entered into a contract (the "Prime Contract") with Parkcrest Builders, LLC ("Parkcrest"), the original contractor, to construct the Project. The initial contract price was $11,288,000.00 and the initial completion date was to be July 27, 2014. The relationship between HANO and Parkcrest deteriorated during the course of the Project and on April 10, 2015, HANO terminated Parkcrest prior to completion. HANO then called upon Liberty Mutual Insurance Company ("Liberty") to perform its obligations as surety for Parkcrest. On June 9, 2015, Liberty entered into a Takeover Agreement with HANO to complete the Project and retained Parkcrest as its completion contractor. The parties resumed work on the Project however, it continued to be plagued by delays and disagreements as to their cause. In May and June 2016, HANO and Liberty could not agree as to whether substantial completion had been obtained. Ultimately, HANO terminated Liberty on June 30, 2016. On October 4, 2016, HANO entered into a contract with Colmex

1

Construction, LLC ("Colmex") to perform all necessary work to complete the Project. On March 25, 2017, HANO granted a certificate of substantial completion to Colmex. To date, the Project has still not reached final completion. Parkcrest, Liberty Mutual, and HANO dispute who is responsible for the various delays in the construction of the Project.

Parkcrest instituted this suit against HANO on May 8, 2015, shortly after the April 10, 2015 termination, alleging that HANO breached the Prime Contract by terminating Parkcrest "for convenience." (Civil Action No. 15-1533, the Principal Action.) HANO filed a counterclaim against Parkcrest alleging that delays in the project were attributable solely to Parkcrest. Shortly after the June 30, 2016 termination, Liberty intervened in the Principal Action, to allege breach of the Takeover Agreement, bad faith breach of contract, and wrongful termination against HANO. In response, HANO filed a counterclaim against Liberty Mutual alleging bad faith breach of the Takeover Agreement and fraudulent misrepresentation.[1] Consolidated with the Principal Action are two related lawsuits against Parkcrest and Liberty Mutual brought by subcontractors R&P Grass Maintenance, LLC ("R&P") and Ted Hebert, LLC ("Hebert") (Civil Action Nos. 16-15849 and 16-14118, respectively).[2]

The Court held a seven-day bench trial beginning on February 20, 2018 through March 1, 2018, and at the conclusion, took the matter under advisement. Having considered all the evidence and counsels' arguments, the Court issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure

---

[1] The Court dismissed HANO's fraudulent misrepresentation claim on June 5, 2017. (Rec. Doc. 207.)
[2] R&P's lawsuit (Civil Action No. 16-15849) settled shortly after the commencement of trial. (Rec. Doc. 472.)

52(a). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**FINDINGS OF FACT**

**Civil Action No. 15-1533: The Principal Action (Parkcrest v. HANO)**

I.      **The Prime Contract between Parkcrest and HANO**

(1)      On March 4, 2013, HANO entered into a contract ("Prime Contract") with Parkcrest whereby Parkcrest would serve as the contractor for the construction of the Florida Avenue: New Affordable Housing Units in New Orleans, Contract No. 13-911-05 ("Project").[3]

(2)      The initial contract price for the Project was $11,288.000.00 and the initial completion date was to be July 27, 2014.[4]

(3)      On September 27, 2013, Construction Change Directive No. 1 was issued providing Parkcrest with an additional 49 non-compensatory days to complete the Project.[5]

(4)      Thus, the original completion date of the Prime Contract, as amended by Construction Change Directive No. 1, was September 14, 2014.[6]

---

[3] Stipulated Fact. *See* Exhibit 9, Prime Contract.
[4] Stipulated Fact.
[5] Stipulated Fact. *See* Exhibit 27, Change Order No. 1.
[6] Stipulated Fact.

(5)     Pursuant to the Louisiana Public Works Act, on March 4, 2013, Liberty issued a statutory payment and performance bond, Bond No. 022045415 (the "Bond") in the amount of $11,288.000.00, in connection with the Project naming Parkcrest as principal and HANO as obligee.[7]

(6)     The Project is intended to be used as multi-family residential housing units.

(7)     The Prime Contract called for twenty-six duplex buildings consisting of fifty-two separate units (fifty-one dwelling units plus one office).  The Project also called for parking, drives, a playground, and two new streets plus infrastructure and utilities to the site.[8]

(8)     The General Conditions of the Prime Contract gave HANO the authority to terminate Parkcrest from the Project for cause or for convenience.[9]

(9)     Paragraph 32 of the Prime Contract defines a "for cause" termination as follows:

> If the Contractor refuses or fails to prosecute the work, or any separate part thereof, with the diligence that will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within this time, the Contracting Officer may, by written notice to the Contractor, terminate the right to proceed with the work (or separable part of the work) that has been delayed.

(10)    Paragraph 34 of Prime Contract defines a termination "for convenience":

---

[7] Stipulated Fact. "[W]hen a public entity enters into a contract in excess of $25,000.00 for the construction, alteration, or repair of any public works, the contractor is required to post a bond 'in a sum of not less than fifty percent of the contract price for the payment by the contractor or subcontractor to claimants as defined in R.S. 38:2242.'" *Pierce Foundations, Inc. v. Jaroy Const., Inc.*, 2015-0785 (La. 5/3/16), 190 So. 3d 298, 301(citing La. R.S. 38:2241(A)(2)).
[8] *See* Exhibit 2323, Watts Report, at 1.
[9] Exhibit 2 at bates 238-39, General Conditions.

The Contracting Officer may terminate this contract in whole, or in part, whenever the Contracting Officer determines that such termination is in the best interest of the [Public Housing Authority ("PHA")] . . .

If the performance of the work is terminated, in whole or in part, the PHA shall be liable to the Contractor for reasonable and proper costs resulting from the termination . . . .

(11)     Clause 32 of the General Conditions of the Prime Contract sets forth the following:

* * *

(b)     The Contractor's right to proceed shall not be terminated or the Contractor charged with damages under this clause if—

(1)     The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include . . . (ii) acts of the PHA or other governmental entity in either its sovereign or contractual capacity, (iii) acts of another contractor in the performance of a contract with the PHA . . .

* * *

(c)     If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been for convenience of the PHA.

(12)     Perez, APC ("Perez") was the architect of record for the Project.[10]

(13)     Section A.1.2.1 of the Model Form of Agreement Between Owner and Design Professional[11] states that:

After receipt of a Notice to Proceed from the Owner, the Design Professional shall prepare and deliver Schematic Design/Preliminary Study Documents. These documents shall consist of a presentation of the complete concept of the Project, including all major elements of the building(s), and site design(s), planned to promote economy both in construction and in administration and to comply with current program and cost limitations. The Design Professional shall revise these documents consistent with the requirements and criteria established by the Owner to secure the Owner's written approval. Additionally, the Design Professional shall make an independent assessment of the accuracy of the information provided by the

---

[10] Stipulated Fact.
[11] Exhibit 88 at 4, A/E Services Contract with HANO.

Owner concerning existing conditions. Documents in this phase shall include:

> Site plan(s)
> Schedule of building types, unit distribution and bedroom count
> Scale plan of all buildings, and typical dwelling units
> Wall sections and elevations
> Outline specifications
> Preliminary construction cost estimates
> Project specific analysis of codes, ordinances and regulations
> Three-dimensional line drawings

(14)    Perez was responsible for reviewing pay applications submitted by Parkcrest for payment on the Project and recommending approval of pay applications to HANO.[12]

(15)    In each certification of payment, Perez attested to HANO that "the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED."[13]

(16)    Weekly construction progress meetings – otherwise referred to as Owner-Architect-Contractor ("OAC") meetings – were held in connection with the Project among representatives of Perez, Parkcrest, and HANO.[14]

(17)    Perez maintained Meeting Agendas and Meeting Minutes for the foregoing weekly OAC meetings for the Project.[15]

---

[12] Stipulated Fact. *See in globo* Pay Applications, Exhibit 455.
[13] *See e.g.*, Exhibit 1138, at bates 15294, Architect Application and Certification for Payment.
[14] Stipulated Fact.
[15] Stipulated Fact.

(18)    Integrated Logistics Support Incorporated ("ILSI") was a subconsultant of Perez and served as the engineer for the street, water, and sewerage portions of the Project.

(19)    On April 3, 2013, HANO issued a Limited Notice to Proceed to Parkcrest for the Project.[16]

(20)    When the Limited Notice to Proceed was issued, HANO still did not have approved civil infrastructure plans for the Project. Parkcrest was unable to proceed with any civil infrastructure work without an approved set of plans.

(21)    The Limited Notice to Proceed did not include any electrical infrastructure[17] work for the Project's residential units.

(22)    The Limited Notice to Proceed only authorized Parkcrest to begin the following work, not to exceed $1,829,174:

> All Work within the public Right-of-Way (ROW) on the new Independence and Pauline Streets; and within the ROW along Congress Street, Law Street, Alvar Street and N. Dorgenois Street; and the three blocks noted as the "Contractor Staging Area" on Sheet T1.3, hereafter noted as the "Work Area".
> 1.    Initial site cleanup
> 2.    Selective demolition
> 3.    Selective clearing
> 4.    Grading within the Work Area
> 5.    Excavation
> 6.    Trenching
> 7.    Fill and backfill
> 8.    Manholes and structures
> 9.    Site storm utility drainage piping, including laterals a minimum of five feet (5') beyond property line in full pipe-length increments

---

[16] Stipulated Fact; *See* Exhibit 11, Limited Notice to Proceed.
[17] Mark Bacques, a senior engineer associate at Entergy, testified at trial that "electrical infrastructure" is the overhead or underground electrical facilities such as power lines, transformers, and so on.

10. Pipe culverts
11. Water mains, valves and laterals up to and including the water meter boxes, which are included as part of the Work Area
12. Sanitary sewer mains and laterals up to and including the cleanouts, which are included as part of the Work Area
13. Street lighting power distribution systems including accessories such as pull boxes
14. Street lighting foundations
15. Concrete paving (including curbs)
16. Concrete drive aprons up to the property line
17. Connection of all elements of Work to existing elements at Congress Street, Law Street, Alvar Street and N. Dorgenois Street.
18. General Conditions associated with the Work within the Work Area, including, but not necessarily limited to:
    a. Building Permits
    b. Field office trailer
    c. Storage containers
    d. Temporary facilities
    e. Field office compound and staging area
    f. Temporary fencing
    g. Site maintenance
    h. Coordination with utility companies
19. Implementation of the Storm Water Pollution Prevention Plan (SWPPP)

(23)    Mike Stewart, the Vice President of Parkcrest and superintendent of the Project for the duration of Parkcrest's involvement, testified that despite receiving this Limited Notice to Proceed, Parkcrest was unable to begin work on most of these items because HANO had not received its approved set of plans from the Department of Public Works ("DPW").[18]

(24)    HANO issued a Full Notice to Proceed on June 7, 2013 for the Project.[19]

(25)    Numerous material delays on the Project were caused by issues and parties out of Parkcrest's control, including but not limited to, the re-design of the water and sewer lines,

---

[18] Stewart Testimony.
[19] Stipulated Fact; Exhibit 13.

delayed supply of permanent power, re-design of site street lighting, installation of gas meters, and the roof vent re-design.

(26)     These delays were caused by HANO, Perez, and other third parties outside the control of Parkcrest, such as the Sewerage and Water Board of New Orleans ("SWB") and Entergy.

## II.     The Delays

### A.   Entergy's Redesign and Installation of Power Poles

(27)     Entergy was a separate, co-prime contractor for the Project due to a separate prime contract between Entergy and HANO for the installation of the electrical infrastructure.

(28)      Parkcrest did not have a contract with Entergy but was responsible for coordinating with all the utility companies to coordinate their work with Parkcrest's work on-site.

(29)     On August 14, 2013, Parkcrest emailed HANO a list of utility contacts and its utility infrastructure schedule which provided the time frames that Parkcrest needed each utility to be completed.[20]

(30)     Generally, with respect to the electrical infrastructure, gas installation, and power pole work, testimony revealed that a proposed layout would be submitted to Entergy, then Entergy would create a design and would invoice HANO for the estimated cost of the work.

---

[20] Exhibit 217, Parkcrest email to HANO dated August 14, 2013.

Once HANO paid that cost, then Entergy would mobilize its construction crews to come install the work.[21]

(31)    As of June 3, 2013, Entergy had yet to install temporary power poles at the Project site, despite Parkcrest's attempt to coordinate with Entergy for their installation.

(32)    Without temporary power, Parkcrest was not able to perform its work on the Project.

(33)    Entergy was responsible for the design and installation of the street power poles at the Project.

(34)    As of December 19, 2013, Entergy's power pole location design was six months overdue. [22]

(35)    In early January 2014, HANO approved payment for Entergy to commence work on pole relocation activities.

(36)    Entergy was not on the Project site to stake the location of the power poles until February 5, 2014.

(37)    In late February 2014, approximately nine months later than Parkcrest planned to start site electrical work, Entergy began installing the new poles.

---

[21] Mark Bacques testimony.
[22] Project meeting dated 12/19/13.

(38)     Entergy had to re-design the power pole design in March 2014 because it did not match the electrical site plans in the Project drawings.[23]

(39)     By April of 2014, Entergy completed its installation of temporary power poles at the Project.

(40)     Parkcrest's expert in schedule analysis and construction, Tom Finnegan, opined that "Entergy's work related to the relocation of the power poles was delayed due to delays in Entergy's design phase and proposal submission, work related to removing the existing power poles, and additional time needed to repair damaged work."[24]

(41)     Delay in relocation of the power poles delayed other Entergy work, including providing site lighting and supplying permanent power to the site.[25]

B.   **Entergy's Design of Underground Utilities/Delay in Providing Permanent Power**

(42)     Entergy was responsible for the design of the electrical infrastructure at the Project, including the design of the underground electrical utilities.

---

[23] HANO email to Entergy dated 3/11/14.
[24] Exhibit 2324, Finnegan Report, at 11.
[25] Stewart testified that HANO was responsible for the Entergy related delays because (1) HANO delayed payment related to the relocation of the power poles and (2) HANO delayed executing a Right-of-Way agreement and paying for design work and infrastructure, which prevented Entergy from installing the electrical infrastructure until September 2014.

(43)     HANO was responsible for contracting with and paying Entergy for the design and construction of that infrastructure, which is required before permanent power is available.

(44)     In August 2013, Parkcrest provided HANO with the contract information and the action items required for HANO to obtain permanent power to the site.

(45)     One of the first steps in the process required HANO to enter into a Right of Way Agreement ("ROW Agreement") with Entergy prior to Entergy installing its infrastructure.

(46)     Entergy did not submit a design for the underground electrical infrastructure on the Project to HANO until March 7, 2014.

(47)     Entergy then submitted a revised design for the underground electrical infrastructure on the Project to HANO on March 25, 2014.

(48)     Perez had no authority to revise Entergy's design of the Project's underground electrical infrastructure.

(49)     Despite having no authority to alter Entergy's underground electrical infrastructure, HANO nevertheless sought Perez's input on the design.  Specifically, on March 25, 2014, HANO requested that Perez review Entergy's revised design for the underground electrical infrastructure.

(50)     HANO did not seek to obtain approval for the ROW Agreement between HANO and Entergy to allow Entergy to begin installation of the underground electrical distribution infrastructure for the Project until Perez reviewed Entergy's revised design for the underground electrical infrastructure.

(51)    The ROW Agreement between HANO and Entergy was not executed by HANO until May 5, 2014.[26]

(52)    Under the terms of the ROW Agreement, Entergy contracted to install the underground electrical distribution infrastructure.

(53)    Accordingly, no contract was in place with Entergy to install the underground electrical infrastructure at the time of issuance for either the Limited Notice to Proceed or the Full Notice to Proceed.

(54)    Parkcrest is not a party to the ROW Agreement.

(55)    Accordingly, as a non-party, Parkcrest had no contractual ability to control Entergy's work pursuant to the ROW Agreement or force compliance with that contract.

(56)    Moreover, HANO contractually granted Entergy eight (8) weeks from the execution of the ROW Agreement to begin the work and up to three (3) months to complete the installation of the underground infrastructure. Accordingly, HANO potentially gave Entergy until September 30, 2014 to complete that work.[27]

(57)    As of the date of the execution of the ROW Agreement, Parkcrest was still under a contractual obligation to complete the Project by September 14, 2014.

---

[26] Stipulated Fact.
[27] Eight weeks from May 5, 2014, the date of the ROW Agreement's execution, was June 30, 2014, and three months from that date was September 30, 2014.

(58)     Nevertheless, the electrical underground infrastructure was required to be complete before Parkcrest could begin certain other aspects of work on the Project.

## C.  Entergy's Installation of Underground Utilities for the Project/Delay in Providing Permanent Power

(59)     As of June 1, 2014, Entergy's work on the underground electrical distribution infrastructure had not yet begun on the Project.[28]

(60)     On June 5, 2014, HANO notified Entergy by email that "the general contractor is preparing to submit a delay claim" because Entergy had still not begun the installation of the underground electrical distribution infrastructure.

(61)     On June 30, 2014, because Entergy had still not begun the installation of the underground electrical distribution infrastructure, HANO notified Entergy "that continued delays are affecting the critical path" of the Project.

(62)     On July 7, 2014, HANO's Project Manager, Hollie DeHarde, and HANO's Construction Manager, Patrick Kennedy,[29] co-authored an internal memorandum analyzing the impact of the known Entergy-related delays as of that date ("Entergy Memorandum").[30]

---

[28] Stipulated Fact.
[29] Patrick Rowan Kennedy, HANO's Construction Manager for the duration of the Project, was assigned to oversee and act as the owner's representative on the site.  His responsibilities included reviewing the progress of the work, providing updates to Jennifer Adams, HANO's Director of Development and Modernization, and assisting in reviewing change orders.
[30] Exhibit 2314, HANO Internal Entergy Memorandum dated 7/7/14.

(63)     According to the Entergy Memorandum, as of July 7, 2014, the Project was twenty-one (21) days behind schedule because of Entergy-related delays, Entergy's underground infrastructure work had not yet begun, and the "contractor is unable to proceed with certain aspects of the project without infrastructure on site."[31]

(64)     In August 2014, Entergy finally reported onsite and began electrical utility installation work.

(65)     Entergy did not complete the installation of its underground utilities and provide power to the site until September 16, 2014, two days after Parkcrest's contract completion date of September 14, 2014.[32]

(66)     Until Entergy was complete with its underground utility installation, Parkcrest was unable to complete multiple critical items at the project, including but not limited to pouring concrete or completing the final grade.

### D.  Kitchen Electrical Outlet Re-Design

(67)     Although Entergy completed the installation of the electrical infrastructure on September 16, 2014, permanent power necessary to commence the interior work was further delayed by HANO's re-design of the kitchen electrical outlets.[33]

(68)     In order for the units to receive permanent power, Parkcrest needed electric meters installed.  However, electric meters could not be installed until the units passed all electrical

---

[31] Exhibit 2314, HANO Internal Entergy Memorandum dated 7/7/14.
[32] Parkcrest email to HANO dated 1/5/15.
[33] Exhibit 2324, Finnegan Report, at 24.

inspections, and the inspections could not be completed until all electric outlets, including the kitchen outlets, were completed.[34]

(69)　　In August 2014, while performing work on the kitchens, Parkcrest's electrical subcontractor noticed a conflict between the proposed location of the electrical outlets and the kitchen backsplashes in the units.

(70)　　Parkcrest immediately notified Perez of the design error. HANO insisted that Parkcrest submit a formal Request for Information ("RFI") requesting direction from Perez on August 15, 2014 on how to proceed instead of just informally resolving what was a relatively simple issue.[35]

(71)　　On September 8, 2014, HANO and Perez changed the design of the outlets and backsplashes to resolve the design conflict.

(72)　　On November 17, 2014, three months after Parkcrest first raised the issue, HANO executed Change Order No. 4, which incorporated the design change and directed Parkcrest to install the redesigned kitchen outlets and backsplashes.[36]

---

[34] Stewart Testimony.

[35] Exhibit 275, RFI 99.  Requests for Information (RFIs) are formal requests for information or direction sent by the contractor to the architect regarding issues that arise during construction.

[36] Exhibit 848, Change Order No. 4; Stewart testified that the design conflict could have easily been resolved in a matter of days and that the formalities unnecessarily delayed Parkcrest's progress on this work.

(73)     Parkcrest installed the re-designed outlets and obtained approved inspections on or about November 20, 2014.[37]  Parkcrest then had to wait for Entergy to inspect the units and install electric meters before permanent power was provided.

(74)     Entergy completed its installation of all electrical meters on the Project on January 5, 2015.[38]

(75)     The meters were required for several critical Parkcrest interior activities, such as installation of vinyl plank flooring and the completion of the HVAC system installation. Finnegan opined that the delays to permanent power did not allow Parkcrest to complete interior finishes prior to April 10, 2015.[39]

### E.  Entergy Gas Meter Installation Delay

(76)     As early as mid-October 2014, Parkcrest was ready for Entergy to begin installing gas meters and requested Entergy to begin this work.[40]

(77)     Similar to permanent power, only HANO could contract with Entergy for these services.

(78)     In December 2014, Entergy informed Parkcrest that they could not start the work until the gas accounts were set up.

---

[37] Project meeting dated 11/20/14.
[38] Exhibit 2324, Finnegan Report, at 25; HANO email to Parkcrest dated 1/9/15
[39] Exhibit 2324, Finnegan Report, at 25.
[40] Exhibit 2324, Finnegan Report, at 28.

(79)    It was HANO's responsibility to secure the gas accounts with Entergy.  HANO had set up electrical account for the units, but did not realize it was required to make a separate and additional request for service for these gas accounts.

(80)    HANO did not set up its gas service accounts until January 2015.[41]

(81)    For reasons outside of Parkcrest's control, Entergy did not begin installing gas meters until April 7, 2015 and even then would only install 20 per week.[42]

(82)    Entergy did not complete its gas meter installation until after Parkcrest was terminated from the Project.

**F.  HANO and Entergy's Delays Involving Street Lights**

(83)    A portion of Parkcrest's scope of work included work to refurbish, relocate, and replace light poles at the Project site.

(84)    HANO wanted to reuse some of the pre-existing light poles for aesthetic reasons, but Parkcrest could not proceed with the pole foundations until DPW approved of the plans to reuse those light poles.[43]

(85)    Parkcrest originally planned to begin the site lighting work in February 2014; however, discussions of revisions to the light pole design among Entergy, HANO, Perez, and other parties continued into May 2014.

---

[41] Project meeting dated 1/22/15.
[42] HANO email to Parkcrest dated 3/26/15; Project meeting dated 4/2/15; Stewart Testimony.
[43] Stewart Testimony.

(86)    Due to delays related to Entergy's work on providing permanent power to the site and continuous reviews and revisions of the site lighting plans, Parkcrest could not begin installation of light pole bases until November 2014, roughly eight months later than it originally planned.[44]

(87)    This delay was outside of Parkcrest's control and affected the critical path of the Project.

(88)     Parkcrest continued to address DPW issues from January 2015 through termination in April 2015.[45]

### G.  Roof Vent Redesign Delay

(89)    On January 7, 2014, Parkcrest issued RFI 56 requesting information on a ventilation system for the roofs because Perez's design at that time did not allow a venting mechanism in the roof system.[46]

(90)    Perez responded to RFI 56 on January 29, 2014, stating that roofing system did not permit or require venting.[47]

(91)    In accordance with this direction, Parkcrest completed installation of all the roofs in April 2014 with no venting system.

---

[44] Exhibit 2324, Finnegan Report, at 13; Parkcrest email to HANO dated 8/6/14.
[45] Exhibit 2324, Finnegan Report, at 13.
[46] Stewart Testimony; Exhibit 334, RFI 56.
[47] Exhibit 334, RFI 56.

(92)     In October 2014, six months after the installation of the roofs was complete, some of the asphalt shingles on one of the buildings were observed to be "buckling."

(93)     In the following weeks, in conjunction with an investigation into the cause of the buckling of shingles, Atlas, the shingle manufacturer, informed Parkcrest that it would not honor its warranty if the attic was not ventilated.

(94)     Perez responded that the attic was part of the conditioned space and that the warranty should not be voided.[48]

(95)     Discussions continued, but in January 2015, Atlas advised the parties that the lack of ventilation would void the applicable warranties, due to excessive condensation and heat build-up in the attic.[49]

(96)     Expert testimony established that Perez's design of the attic was a breach of the applicable standard of care.[50]

(97)     Parkcrest suggested a potential solution to the design issue, installation of ridge vents, which was approved by Atlas to meet the warranty requirements in February 2015.[51]

---

[48] Exhibit 620.
[49] Exhibit 745, Atlas letter dated 1/12/15.
[50] Exhibit 2323, Watts Report, at 5.
[51] Project meeting dated 2/5/15.

(98) Perez issued a Request for Proposal ("RFP") for Parkcrest to install the proposed venting on February 20, 2015, and Parkcrest submitted its proposal for the work on March 2, 2015.[52]

(99) Parkcrest subsequently submitted additional information regarding its proposal on April 8, 2015.[53]

(100) HANO did not respond to Parkcrest's proposals until after Parkcrest's termination and after Liberty had taken over the Project.[54]

## H. The Revised Sewerage and Water Board Plans

(101) The Project was also delayed as a result of late approval by the Sewerage and Water Board ("SWB") of redesigned site plans and unforeseen difficulties in locating the utility tie-ins for the Project.

(102) Per Parkcrest's utility schedule, the installation of water and sewer lines was planned to start in May 2013 and to be completed in September 2013, for a planned duration of approximately four months.

(103) Perez, through ILSI, provided Civil Site Drawings, C3.00 and C3.20, indicating where the utility tie-ins should be located throughout the Project.

---

[52] Parkcrest letter to HANO dated 6/17/15.
[53] Parkcrest letter to HANO dated 6/17/15.
[54] Stewart Testimony.

(104)   Ultimately, the utility tie-ins on Alvar Street were not where the plans depicted them to be.

(105)   Parkcrest was required to perform exploratory digging to locate the utility tie-ins on Alvar Street and Congress Street for the Project.

(106)   Beginning in June 2013, Durr Construction, LLC ("Durr"), the original site work subcontractor, struggled to locate the utility tie-ins/existing sewer and water lines as shown in the utility plans.

(107)   In June 2013, Parkcrest asked HANO for copies of the Project infrastructure "as-builts" for guidance on the location of the tie-ins.[55]  A HANO internal email shows that Kennedy had the infrastructure as-builts from 2003 but specifically withheld the documents from Parkcrest due to his concern over possible differences between the as-builts and the drawings submitted for bid.  Specifically, Kennedy stated, "I do not want to give any ammunition for change orders if it is not necessary."[56]

(108)   Parkcrest was never provided the as-builts while it was performing exploratory digging or at any time prior to its April 10, 2015 termination.[57]

(109)   In November of 2013, HANO and Parkcrest met with SWB to discuss site utility tie-ins on Alvar Street for the Project.[58]

---

[55] Exhibit 218, June 26, 2013 email from Kennedy to DeHarde.
[56] Exhibit 218, June 26, 2013 email from Kennedy to DeHarde.
[57] Exhibit 940, Project 2003 infrastructure as-builts.  It was not until July 7, 2015 that Perez emailed the 2003 as-builts to Parkcrest, after the Takeover Agreement was executed and after Parkcrest had been terminated.
[58] Stipulated Fact.

(110)   After eventually locating the existing utilities on Alvar and Congress Streets, Parkcrest issued RFI No. 51 on December 12, 2013, seeking direction on several design issues, including how to tie into the existing utility connections.[59]

(111)   HANO, its representatives, Parkcrest, and SWB met in both January and February 2014 to discuss the issues, and HANO's design team acknowledged that re-designed drawings would be required.[60]

(112)   ILSI did not substantively respond to RFI No. 51 until February 27, 2014, wherein Nick Clark, the civil and structural engineer of record for ILSI, acknowledged that the utility tie-in plans for Alvar and Congress Streets had to be revised per the results of Parkcrest's exploratory digging and re-submitted for approval to SWB.

(113)   In late February of 2014, ILSI provided SWB with copies of the amended Civil Site Drawings, C3.00 and C3.20, relating to utility tie-in locations for Alvar and Congress Streets.[61]

(114)   SWB had to stamp and re-approve ILSI's amended Civil Site Drawings before Parkcrest could begin the utility tie-in work.

(115)   Between March of 2014 and September of 2014, testimony revealed that Parkcrest made every reasonable effort to obtain the revised, stamped drawings from SWB.

---

[59] Exhibit 2324, Finnegan Report, at 14; Exhibit 942, RFI No. 51 dated 12/13/13.
[60] *See* ILSI email to HANO and Parkcrest dated 1/13/14.
[61] Stipulated Fact.

(116)   SWB eventually approved of the re-designed tie-in plans for Alvar and Congress Street, which were stamped by SWB on September 3, 2014.[62]

(117)   Receiving revised civil drawings 15 months into the Project dramatically changed how the utility connections had to be installed such that Parkcrest was forced to find a replacement contractor to perform the work.

(118)   Parkcrest entered into a time and materials contract with Ted Hebert, LLC ("Hebert") to complete the Alvar and Congress Street sewer and water line work.

(119)   After receiving the stamped drawings, further issues arose with respect to Hebert's placement of the Alvar Street sewer line within HANO's property requiring comment by SWB.[63]

(120)   As of Parkcrest's termination on April 10, 2015, the Alvar Street water and sewer tie-in issues had not been resolved.

(121)   With respect to Congress Street, Hebert experienced difficulty in January and February 2015 with the sewer line installation,[64] but the work was ultimately completed in March 2015 prior to termination.[65]

---

[62] Stipulated Fact.
[63] The issues concerning Ted Hebert's placement of the Alvar Street Sewer line are discussed in detail *infra* at 70.
[64] Project meeting dated 2/5/15.
[65] Exhibit 2324, Finnegan Report, at 15.

I. __Flatwork, [66] Gutters, Windows__

(122)   The completion of the street and sidewalk flatwork was dependent upon the installation of the underground utilities, which was delayed due to SWB's redesign work.[67]

(123)   The installation of exterior gutters and downspouts was incomplete as of Parkcrest's termination on April 10, 2015 due to the delays to final grading, which was in turn delayed by Entergy and SWB underground infrastructure delays.[68]

(124)   As of Parkcrest's termination on April 10, 2015, nearly all window leak issues had been resolved, but Parkcrest had not been able to satisfy all of HANO's unreasonable requests regarding the windows.

III.   __Notice of Default and Parkcrest Termination__

(125)   Parkcrest repeatedly updated HANO of the delays it was experiencing at the Project and HANO was aware of all delays experienced by Parkcrest.

(126)   Parkcrest did not fail to provide a contract performance schedule timely and as necessary.  It also did not fail to maintain a critical path schedule[69] or to coordinate with utilities as necessary.[70]

---

[66] The Court understands "flatwork" to generally mean work concerning the concrete that rests on the ground, such as, driveways and sidewalks.
[67] Exhibit 2324, Finnegan Report, at 15, 17.
[68] Exhibit 2324, Finnegan Report, at 31;  *See* Stewart Testimony.
[69] *See* Finnegan Testimony and OAC meeting minutes.
[70] Additionally, it was impractical for Parkcrest to maintain a grade within six inches throughout the extended period of time that Entergy had to complete the underground infrastructure while Parkcrest was also expected and attempting to complete other work on the Project.  The evidence established that Parkcrest merely needed

(127)   On September 12, 2014, Parkcrest issued written notification to HANO of the following delays: (1) the supply of permanent power infrastructure to the Project worksite; (2) delay related to site lighting; (3) delays in obtaining accounts for gas meters which were installed by Entergy; (4) issues related to roof design and ventilation; and (5) a design change made to the sewer system.[71]

(128)   In the notice, Parkcrest also stated that the extent and total impact of these delays was unknown because many of the aforementioned issues were out of Parkcrest's control.

(129)   The delays - and the fact that they were out of Parkcrest's control - had been discussed at OAC meetings prior to this written notice.[72]

(130)   On September 15, 2014, HANO sent Parkcrest a Notice of Default.[73]

(131)   On April 10, 2015, HANO terminated Parkcrest from the Project and made demand upon Liberty to complete the Project.[74]

(132)   Gregory Fortner, the executive director at HANO, made the decision to terminate Parkcrest without consulting any HANO representative regularly involved in the Project.[75]

(133)   As of April 10, 2015, the Project was 93.8 percent complete.[76]

---

a half day's notice to achieve the grade prior to Entergy arriving on site and that Parkcrest communicated that fact accordingly.
[71] Exhibit 350; Exhibit 17, Letter from Parkcrest to HANO dated 9/12/14.
[72] Stewart Testimony.
[73] Stipulated Fact.
[74] Exhibit 22, Notice of Final Default and Termination to Parkcrest dated 4/10/15.
[75] Testimony of Gregory Fortner.
[76] Exhibit 455, Pay Application 22;  *See* Exhibit 2324, Finnegan Report, at 36. This percentage is based off of Pay Application 22 (dated February 26, 2015), which was the last pay application submitted by Parkcrest

(134)  As of April 10, 2015, Entergy had not completed its gas meter installation for the Project.  It was impossible for Parkcrest to complete the Project without Entergy completing its gas meter installation.

(135)  As of April 10, 2015, the issue of the Alvar street water and sewer tie-ins remained unresolved.[77]  In turn, the exterior work that remained included certain flatwork, landscaping, and fencing, which were impractical, if not impossible, to complete without the resolution of the sewer and water issues.

(136)  As of April 10, 2015, neither HANO nor Perez had authorized Parkcrest to begin the installation of roof vents for all 52 units of the Project.  It was impossible for Parkcrest to complete the Project without installing roof vents for the 52 units at the Project.[78]

(137)  The record revealed that Parkcrest performed sufficient project management, quality control, and supervision of the work on the Project.[79]

(138)  Any delays attributable to Parkcrest were concurrent with other Project delays not attributable to Parkcrest, such as roof vent installation and delivery and installation of gas meters.[80]

---

prior to its April 2015 termination.  Finnegan opined that Pay Application 22 provides the clearest detail into the work completed by Parkcrest prior to its termination on April 10, 2105. *See also* Stewart Testimony.
[77] Project meetings dated 4/2/15 and 6/18/15.
[78] Exhibit 2324, Finnegan Report, at 36.
[79] *See e.g.*, Brad Fisher testimony.
[80] Exhibit 2324, Finnegan Report, at 32.

(139) On April 10, 2015, Liberty was notified of Parkcrest's termination from the Project and immediately began its investigation into the Project and termination of Parkcrest.

## IV. From Termination of Parkcrest through Execution of the Takeover Agreement

(140) On June 1, 2015, Liberty, HANO, and Parkcrest executed the Interim Takeover Agreement for the Project and Parkcrest began performing the work required by the Interim Takeover Agreement, including cleaning and securing the Project site.

(141) On June 9, 2015, Liberty and HANO executed the Takeover Agreement for the Project.[81]

(142) Utilizing its sole discretion under the Takeover Agreement, Liberty hired Parkcrest to serve as the "Completion Contractor" to complete the work under the Takeover Agreement.[82]

(143) At the time of Liberty Mutual's takeover, HANO had paid Parkcrest $9,909,046.57, and the remaining balance on the Contract was $1,363,318.43.

(144) Rudy Dominguez, surety claims counsel for Liberty, testified that hiring Parkcrest as the Completion Contractor was the most cost-effective and efficient means of completing the Project.[83]

---

[81] Stipulated Fact; Exhibit 23, Takeover Agreement.
[82] Stipulated Fact; Exhibit 24, Completion Contract between Parkcrest and Liberty dated 6/9/15.
[83] Dominguez testimony.

(145)   Paragraph 1 of Takeover Agreement states that

> Surety agrees to arrange for the performance of all work needed to complete the Project in accordance with the terms and conditions of the Contract. The terms and conditions of the Contract with any amendments, modifications, or change orders as of the date of this Agreement, are incorporated by reference and, except as set forth herein, shall govern the rights and liabilities of the parties hereto. However, neither the incorporation of the Contract nor any of the Contract documents included by reference therein shall abridge, reduce, diminish, or modify in any way any of the rights, limitations, defenses, and/or claims available to Surety nor shall any provision therein or herein diminish, increase or expand in any way the obligations and/or responsibilities of the Surety beyond those required of the Surety under the Louisiana Public Works Act (La. R.S. 38:2181, *et seq.,* La. R.S. 38:2211, *et seq.,* and La. R.S. 38:2241, *et seq.)* ("Public Works Act").

(146)   Paragraph 2 of the Takeover Agreement limits Liberty's liability to the penal sum of its Bond.[84]

(147)   Per Paragraph 5 of the Takeover Agreement, Liberty agreed to complete the work by August 7, 2015, with completion of the work as "substantial completion" under La. Rev. Stat. § 38:2241.1.[85]

(148)   The Takeover Agreement specifies that if Liberty did not bring the Project to substantial completion by August 7, 2015, liquidated damages would accrue at a rate of $1,189.00 per day until the work was substantially complete.

(149)   HANO released Liberty from any claim to liquidated damages accruing between April 10, 2015 and August 7, 2015 under the Takeover Agreement.

---

[84] *See* Rec. Doc. 207 at 19, Court's Order and Reasons dated 6/5/17.
[85] Exhibit 23, Takeover Agreement.

## V.    From Execution of the Takeover Agreement through HANO's Termination of Liberty from the Project

(150)   After execution of the Takeover Agreement, Liberty and Parkcrest immediately took steps to remobilize at the Project.

(151)   Within weeks of returning to the site, HANO directed Liberty to demolish previously constructed and approved balconies for 13 of the 26 buildings at the Project, which would have resulted in months of additional delay to the Project. Ultimately, HANO withdrew this improper directive.[86]

(152)   On June 26, 2015, more than 18 months after Parkcrest originally raised the issue in RFI 56, Perez issued a formal request for proposal for Liberty to install roof vents at the Project.[87]

---

[86] *See* Exhibit 27, Construction Change Directive. Specifically, the record revealed that Parkcrest submitted a proposal for "value engineered balconies," which called for different and less expensive materials from those stated in the Contract. HANO approved the "value engineered balconies" in the first change order (executed 10/9/13). Because less expensive materials were used, Parkcrest gave HANO a $22,300 credit. On July 13, 2015, after returning to the Project following the April 10, 2015 termination, HANO demanded that the balconies be demolished and reconstructed in accordance with the original contract documents. *See* Exhibit 1083, ASI 15, dated 7/13/15. Stewart testified that it took a "tremendous" effort to explain everything to HANO again, to convince them that this was unnecessary, and that the "value engineered balconies" had previously been approved. HANO eventually rescinded its order for the demolition of the balconies in ASI 18. *See* Exhibit 1084, ASI 18, dated 10/1/15. ASI 18 also stated that the balconies in Buildings 23 and 25 "remain rejected" based on a separate deficiency - the concrete was poured while it was raining. HANO based its rejection on the findings within an ILSI memorandum concerning the balconies. However, this memorandum does not support HANO's determination that the balconies are deficient. ILSI concluded from its review of the concrete that "the concrete was placed properly and should have adequate strength". ILSI merely recommended periodically monitoring the balconies for cracks. *See* Exhibit 114, ILSI Memorandum dated 7/7/14.

(153)   On August 13, 2015, HANO executed Change Order No. 6, directing Liberty to install roof vents and allowing Parkcrest through November 8, 2015, over two months past the August 7, 2015 completion date, to complete this work.[88]

(154)   On August 14, 2015, HANO issued a Notice of Default to Liberty alleging that Liberty had failed to complete the work within the time specified in the Takeover Agreement.[89]

(155)   On November 25, 2015, Brad Fisher of Parkcrest requested punch list inspections for Buildings 1-16.[90]

(156)   On December 1, 2015, Fisher requested punch list inspections for Buildings 17-26.[91]

(157)   On December 11, 2015, Fisher again requested punch list inspections beginning December 14, 2015 and substantial completion of the Project as of December 21, 2015.[92]

(158)   As of December 15, 2015, Mark Clayton, the primary project manager for Perez and acting architect for the Project, performed a punch list inspection for the exterior of Building 1.  Clayton stopped his review upon discovering deficiencies in the exterior of Building 1.

---

[88] Exhibit 25, Change Order No. 6 dated 6/30/15; *see* Finnegan Testimony.
[89] Exhibit 1256, Notice of Default dated 8/14/15.
[90] Exhibit 375, Email from Parkcrest dated 11/25/15.
[91] Exhibit 376, Email from Parkcrest dated 12/1/15.
[92] Stipulated Fact; Exhibit 378, Email from Parkcrest dated 12/11/15.

(159)   Two weeks later, on December 30, 2015, Clayton formally notified HANO that he reviewed Parkcrest's work on Building 1 and that the work was not ready for substantial completion.

(160)   Although he served as the acting architect on the Project, Mark Clayton was not, and never has been, a licensed architect.

(161)   The City of New Orleans Departments of Safety and Permits (the "City" or "DSP") is "[t]he officer or other designated authority charged with the administration and enforcement" of the applicable building codes.

(162)   By December 31, 2015, the City had inspected the Project and found that the work performed by Parkcrest "was completed in compliance with the applicable provisions of the New Orleans Amendments to the International Building Code and Comprehensive Zoning Ordinance."

(163)   By December 31, 2015, the DSP had issued Certificates of Occupancy and Completion for all 52 units.[93]

(164)   The Date of Full Availability ("DOFA") is the "last day of the month in which substantially all (95 percent or more) of the units in a public housing project are available for occupancy."[94]

---

[93] Stipulated Fact "under different phrasing." *See* Exhibits 30 to 80.
[94] *See* 24 CFR 905.108.

(165)  HANO represented to the U.S. Department of Housing and Urban Development ("HUD") that the DOFA for the Project was December 31, 2015.[95]

(166)  As proof that substantially all of the units were available for occupancy, HANO submitted the 52 Certificates of Occupancy for the Project to HUD.

(167)  As of December 31, 2015, the Project could be occupied and used for its intended purpose as a multi-family residential dwelling.

(168)  Liberty did not receive a Preliminary Punchlist Evaluation until January 6, 2016.[96]

(169)  Beginning in late December 2015, Parkcrest repeatedly requested substantial completion punch list inspections from HANO and Perez on all 52 units.  For a majority of the units, Parkcrest had to make a minimum of three requests through March and April 2016 before HANO or Perez performed an inspection or provided a punchlist therefrom.[97]

(170)  On March 23, 2016, Perez approved Pay Application No. 31T for the Project recommending payment in the amount of $32,475.96.[98]

(171)  Perez's Architect's Certificate for Payment for Pay Application No. 31T also indicated the Project was 99.3 percent complete.

---

[95] Stipulated Fact "under different phrasing." Exhibit 2318, HANO Notice of Date of Full Availability to HUD dated 2/29/16.
[96] Exhibit 759, Clayton email to Parkcrest dated 1/6/16.
[97] Exhibit 613, Parkcrest internal spreadsheet for punchlist inspection requests dated 6/9/16.
[98] Stipulated Fact.

(172)    On April 20, 2016, HUD determined that the Project had achieved DOFA on December 31, 2015.[99]

(173)    On May 6, 2016, Clayton attempted to inspect Buildings 1-5, but did not make it past the exterior of Building 1 after noticing deficiencies.

(174)    HANO and Perez did not complete most of the punch list inspections until May 9, 2016.

(175)    On May 17, 2016, after making little to no progress with HANO to get the Project accepted, Liberty informed HANO by letter that it considered the Project to be substantially complete.[100]

(176)    On or about May 20, 2016, HANO stated that it refused to accept the Project as substantially complete.[101]

(177)    On May 26, 2016, Perez executed the Architect's Certificate for Payment for Pay Application No. 33T recommending payment in the amount of $25,959.74 for the Project.[102]

(178)    Perez's Architect's Certificate for Payment for Pay Application No. 33T indicated the Project was 99.68 percent complete.[103]

---

[99] Stipulated Fact.
[100] Stipulated Fact; Exhibit 2302, Liberty letter to HANO dated 5/17/16; Dominguez testimony.
[101] Stipulated Fact.
[102] Stipulated Fact.
[103] Exhibit 455, at 423, Pay Application 33T.

## A. The June 9, 2016 Punchlists and the Red Line Items

(179)   On June 9, 2016, Clayton sent a letter to HANO stating that he was unable to grant substantial completion.[104]

(180)   On June 9, 2016, Clayton reissued punchlists for ten (10) of the buildings and provided, for the first time, punch lists for the remaining sixteen (16) buildings.[105]

(181)   Liberty and Parkcrest's expert architect with a specialty in publically-owned, multi-family housing design and contract administration, Jerry Watts, opined that the long delay in issuing these punchlists was a breach in the standard of care and that architects normally issue punch lists within seven to ten days after inspection is performed.[106]

(182)   Parkcrest's expert in schedule analysis and construction, Tom Finnegan, opined that "HANO/Perez's delayed issuance of punchlist documents was the critical driver of delay between [Parkcrest's] receipt of Final Certificates of Occupancy and Completion from the City of New Orleans in November and December and the June 29, 2016 termination."[107]

(183)   The June 9, 2016 punchlists consisted of approximately 700 pages of allegedly non-conforming items.

---

[104] Stipulated Fact.
[105] Exhibit 417, Punchlist dated 6/9/15.
[106] Exhibit 2323, Watts Report, at 8.
[107] Exhibit 2324, Finnegan Report, at 3 ¶ 13.

35

(184)   The "red line items" – items listed in red font in the June 9, 2016 punchlists - constituted the exclusive list of items that HANO claims prevented it from granting substantial completion.[108]

(185)   The June 9, 2016 punchlists were vague, repetitive, and contained many items that had already been completed by Parkcrest prior to June 2016.[109]

(186)   The red line items did not prevent substantial completion because either all the corrective work had been completed prior to June 2016, the City had accepted the work, or the items would not have otherwise prevented the intended use of the units, i.e., occupancy.[110]

(187)   Upon notification of non-complying work, Parkcrest and Liberty immediately developed a plan of action and quickly corrected the non-complying issues.[111]

---

[108] *See* Rec. Doc. 467, Order Granting Liberty's Motion in Limine to Limit HANO's Use of Non-Red Items (Rec. Doc. 235) and Parkcrest's Motion in Limine on Punch List Items (Rec. Doc. 233); *see also* Rec. Doc. 206, Order on Motion to Compel.  Items that are not red line items, and therefore did not prevent HANO from granting substantial completion, include HVAC issues and final DPW acceptance.

[109] Stewart testimony; Exhibit 2323, Watts Report at 6-8.  Watts opined that Perez wrongly listed a multitude of items on the June 9, 2016 punchlists including: hardiplank siding work, water heater stands, front porch balcony edge and fascia lights, plumbing and mechanical issues (HVAC grilles/registers, air balance, dirt in water lines, insulate attic water lines), electrical issues (missing panel, load centers, missing light and receptacles, GFI outlets, breakers).

[110] Exhibit 2323, Watts Report at 9, 10.  For example, the following red line items were either completed prior to June 2016, accepted by the Authorities with Jurisdiction prior to June 2016, or otherwise would not have prevented or interfered with occupation of the units: issues with step handrail height being inconsistent or out of allowable range; issues with the step riser height or tread depth being non-compliant with the code; missing electrical outlets; UFAS (Uniform Federal Assessability Standards) issues of non-compliant sink aprons and wall cabinet heights; incorrect porch slope; bar top height measured at 34 1/8" on living room side; building envelope voids; water heater function; issues involving the interior stairs being code non-compliant; gas function; and handrail installation.

[111] Stewart Testimony; Watts Testimony and Report.

(188) The Contract Document Specifications provide that the General Contractor, at his option, may turn over portions of the work in phases. HANO and Perez wrongfully denied Parkcrest and Liberty this option.

(189) On June 13, 2016, HANO inquired as to whether Liberty would extend insurance and security for the Project.[112]

(190) On June 14, 2016, Liberty sent HANO a letter in which Liberty reaffirmed its position that the Project was substantially complete,[113] however, Liberty agreed to extend insurance and security for the Project through July 1, 2016.[114]

(191) Parts of the Project to be dedicated for public use – such as streets, curbs, catch basins, sidewalks, and streetlights – require DPW acceptance. ILSI is required to inspect and provide a recommendation to the DPW regarding whether the DPW should accept the streets and other site work on the Project ("DPW Site Work").

(192) Ronald Shumann, an ILSI engineer, performed the inspection in June 2016 for the DPW Site Work and created a punchlist (the "ILSI punchlist") with items that he identified as not meeting the contract construction plans and specifications or otherwise deficient in some manner.[115]

---

[112] Exhibit 246, HANO email to Liberty dated 6/13/16.
[113] Stipulated Fact.
[114] Exhibit 421, Liberty letter to HANO dated 6/14/16.
[115] Exhibit 426, Shumann email to Clayton with punch list dated 6/22/16. The ILSI punchlist items included nonconforming sidewalk intersections, ADA ramps at street intersections, curbs, gutters, catch basins, street work, driveways, sidewalks, and grading of the site.

(193)   Based on the ILSI punchlist, Shumann did not recommend acceptance to the DPW and broadly estimated the cost to complete the ILSI punch list at $500,820.00.[116]

(194)   Liberty received the ILSI punchlist and the punchlist for building 7 on June 22, 2016.[117]

(195)   On June 30, 2016, HANO directed Liberty by letter to relinquish keys and control of the Project to HANO.[118]

(196)   On June 30, 2016, HANO terminated Liberty and Parkcrest from the Project.[119]

(197)   Prior to terminating Liberty, HANO did not inquire as to whether Liberty would extend insurance and security for the Project as it had previously.[120]

(198)   In fact, approximately two weeks earlier, on June 15, 2016, HANO determined that it would not allow Liberty to extend insurance and security for the Project again.[121] Liberty had no knowledge of that decision.[122]

(199)   HANO has not paid Liberty or Parkcrest in full for the work performed on the Project through June 30, 2016.

---

[116] Exhibit 426 at bates 5013, Shumann email to Clayton with punch list dated 6/22/16.  Exemplifying some of the strange circumstances surrounding this case, testimony revealed that a DPW representative performed an inspection of the DPW Site Work and subsequently sent Parkcrest/Liberty an email stating that DPW had accepted the streets.  However, this email failed to comply with the formalities for DPW acceptance.
[117] However, by Court order, DPW acceptance was **not** required for substantial completion because it was not a red line item nor did it prevent the units from being inhabited as intended. *See supra* note 108.
[118] Stipulated Fact; Exhibit 81, HANO termination letter to Liberty dated 6/29/16.
[119] Exhibit 81, HANO termination latter to Liberty dated 6/29/16.
[120] Exhibit 430, Liberty response to termination letter.
[121] Exhibit 420, HANO email dated 6/15/16.
[122] Dominguez testimony.

(200)   HANO refused to accept the Project as substantially complete on or before June 30, 2016.[123]

(201)   Watts opined that the Project was substantially complete in December 2015, "certainly on or before June 30, 2016", and that HANO/Perez wrongfully denied granting substantial completion.[124]

(202)   The Court finds that the Project was substantially complete by December 31, 2015.

(203)   Parkcrest and Liberty dutifully prosecuted the work at all times.

(204)   The testimony and evidence revealed that HANO became nearly impossible to satisfy, at least as Parkcrest and Liberty were concerned.

(205)   Some of the punchlist items that HANO claimed prevented substantial completion bordered on the ridiculous.  For example, one punchlist item stated that an electrical outlet did not function. However, witness and expert testimony revealed that the outlet merely needed to be reset and the solution was the equivalent to pushing a button.[125] Another item stated that there was an open "J" box in the attic of one of the units.  Not only was this item corrected before the City Inspections in December 2015, but it was unreasonable for it to be considered an item that would prevent occupancy because the correction simply required adding a simple cover to the box.  Additionally, one punchlist item was that the gas lines were not operational.[126] Stewart testified that the gas had been turned off as a

---

[123] Stipulated Fact.
[124] Exhibit 2323, Watts Report, at 9.
[125] Exhibit 417, at 36; *see also* Stewart Testimony.
[126] Exhibit 417, at 7 and 319.

safety precaution while the Project was still under construction. All that was required to remedy this item was merely turning a valve and it should not have been included as a punchlist item.

(206) Watts testified that the architect's contract administration and the owner's contributions to the Project impeded Parkcrest's efforts and ability to complete the work.[127]

(207) HANO's efforts were often unhelpful, vague, and overly burdensome, which made Parkcrest and Liberty's efforts to finalize the Project more difficult, time-consuming, and unreasonably tedious. For example, throughout the June 9, 2016 punchlists, Perez/HANO would often list a general item or defect, such as a window or a tile, without giving Parkcrest any idea about which window or tile to which it was referring.[128] Stewart testified that these vague descriptions required Parkcrest to check every single window or tile and that he often found that that these defects did not exist at all. With respect to the concrete steps, when Parkcrest received the June 9, 2016 punchlists, it undertook a "monumental effort" to survey and try to comply with the measurements on every step and riser on the Project. ILSI/Perez complained that the concrete steps were not uniform and were required to have a 6" riser and 11" tread.[129] Watts opined that the code established a maximum riser height for residential steps at 7 ¾" and a minimum tread depth of 10", which properly takes into account varying jobsite conditions.[130] Nevertheless, Parkcrest produced a detailed spreadsheet of the entire site, identified all the riser heights, and

---

[127] Watts testimony.
[128] *See* Exhibit 417, at 288, 291.
[129] *See* 10/22/13 report 90 from ILSI.
[130] Exhibit 2323, Watts Report, at 4.

corrected or was in the process of correcting the non-conforming steps prior to the June 2016 termination. Thirty-one of these corrections were 1/8" or less and the majority of the other corrections were ¼" inch or less. Additionally, Kennedy testified that he spent two hours each day creating daily field reports with detailed updates on the progress of Parkcrest's work and corresponding photographs. However, Kennedy failed to share a single one of these field reports with Parkcrest. Stewart testified that such reports would have better identified HANO's issues and greatly assisted Parkcrest's completion of the Project.

(208)   Generally, an item that has been approved and certified by the architect for payment by the owner should not be rejected. According to Watts, the subsequent rejection of approved items demonstrates an unacceptable standard of care in the project design and contract administration.

(209)   The manner and extent to which HANO enforced certain contract provisions and compliance with the code was unreasonable and overly burdensome under the circumstances. HANO determined that items that were not in strict compliance with the code prevented substantial completion despite the fact that the City, the Authority with Jurisdiction over code issues, had already approved of them. Testimony established that the only reason for an owner to enforce the code is to ensure that the Project will pass City inspections and not prevent Certificates of Occupancy from being obtained.[131]   Moreover,

---

[131] There was no evidence that any non-code compliant work created a potential life or safety hazard.

even when items complied with the code, HANO demanded strict compliance with certain contract specifications that, like demanding code compliance for items that had already passed City inspection, served no justifiable purpose. For example, HANO required a consistent 36" height on all handrails. The code allows for a 34" minimum and 38" maximum height which, as expert testimony revealed, reflects normal construction tolerances and allows slight exceptions to exact dimensions.[132] Parkcrest specifically confirmed with the architect that a handrail height between 34" and 38" would be acceptable on the Project per the code regulation.[133] However, subsequently, HANO decided to enforce the contract documents requiring consistent heights of 36" and Clayton deferred to HANO's decision.[134] Watts opined that strict enforcement of this 36" measurement in contravention of normal construction tolerances was "excessive."[135] The handrails were compliant because they were approved by the City prior to issuing the Certificates of Occupancy. Stewart testified that he also personally went around the entire Project and measured every handrail to ensure that they were within the 34" and 38" range.

(210)   HANO and Clayton maintained an irregular and questionable relationship as owner and architectural design professional. Watts' expert opinion confirmed that in the construction industry, it was unusual for the Owner's representative to dictate instructions to the design professional on how to approve or reject work.[136] The record reveals that HANO usurped the role of the design professional at many critical moments on the Project.

---

[132] Exhibit 2323, Watts Report.
[133] Exhibit 594, Mark Clayton email to Parkcrest dated 12/19/14.
[134] Stewart testimony.
[135] Exhibit 2323, Watts Report, at 5.
[136] *See* Clayton testimony; Exhibit 2323, Watts Report, at 5.

For example, HANO generally requested to review meeting minute entries before Clayton forwarded them to the rest of the construction team.[137] In one particular instance, Kennedy directed Clayton to "be very careful with the language pertaining to Entergy work" in the meeting minutes because Kennedy expected that Parkcrest was going to use it as a part of a delay claim.[138]  Other instances include Kennedy drafting the June 9, 2016 letter for Clayton to send to Parkcrest stating that he could not grant substantial completion; Kennedy instructing Clayton as to which punchlists he should release to Parkcrest and which ones he should hold back;[139] Kennedy providing Clayton with the protocol for certain concrete placement, which Clayton then copied and pasted into a document with the Perez letterhead;[140] and Kennedy drafting an email regarding the punch list process, which Clayton copied and pasted nearly verbatim before forwarding it to Parkcrest.[141]

(211)   It was unnecessary for Parkcrest to file official delay claims against HANO because the record demonstrates that the weekly OAC meetings and multitude of communications between the parties provided HANO with sufficient notice of any delays.[142]

## VI.    HANO and Colmex Contract to Complete

(212)    Following the termination of Liberty, HANO sought to relet the Project.

---

[137] Exhibit 296, Kennedy email to Clayton dated 7/8/15.
[138] Exhibit 239, Kennedy email to Clayton dated 10/9/14.
[139] Exhibit 244, Kennedy email to Perez dated 6/9/16; Exhibit 417, Punchlists dated 6/9/16.
[140] Exhibit 1673, Kennedy email to Clayton dated 10/24/13.
[141] Exhibit 405, Clayton email to Parkcrest dated 4/20/16; Exhibit 406, Kennedy email to Clayton dated 4/20/16.
[142] Stewart also testified that Parkcrest did not file an official delay claim against HANO in the interest of encouraging a harmonious and collective effort to simply finish the Project as soon as possible.

(213)   HANO began culling down the punchlists issued to Parkcrest/Liberty to develop a revised scope of work for prospective bidders.

(214)   On August 12, 2016, HANO issued the "Invitation for Bids for Completion and Corrective Work at Florida Avenue New Affordable Housing Unites, IFB # 16-912-41," ("Re-bid Documents").[143]

(215)   HANO accepted Colmex Construction, LLC's ("Colmex") bid, having received no other bids.[144]

(216)   On October 4, 2016, HANO and Colmex executed a contract for the "Completion and Corrective Work at Florida New Affordable Housing Units," Contract No.: 16-912-41 (the "Colmex Completion Contract"), in the amount of $1.7 Million.[145]

(217)   On November 16, 2016, Colmex was directed to proceed with the work on the Project.[146]

(218)   No work was performed on the Project between July 1, 2016 and November 15, 2016, a period of over four months.[147]

(219)   HANO and Colmex executed Change Order No. 1, dated November 16, 2016, in which the Colmex Completion Contract time was extended by eight (8) days.[148]

---

[143] Stipulated Fact.
[144] Stipulated Fact.
[145] Stipulated Fact.
[146] Stipulated Fact; Exhibit 87, Colmex Notice to Proceed dated 11/15/16.
[147] Adams testimony.
[148] Stipulated Fact.

(220)    HANO issued Change Order No. 1 because Colmex needed additional time to obtain payment and performance bonds for the Project.[149]

(221)    HANO allowed for phased substantial completion in connection with Colmex's work on the Project.[150]

(222)    On March 25, 2017, HANO issued a certificate of substantial completion to Colmex in connection with Colmex's work on the Project.[151]

(223)    The record shows that HANO relaxed its requirements for Colmex to achieve substantial completion by moving certain items to the final completion phase.

(224)    When HANO granted substantial completion to Colmex on March 25, 2017, HANO did not require that Colmex obtain final approval of streets, catch basins, sidewalks, curbs, ADA ramps, street lights and/or street signage from the DPW.[152]

(225)    On or about April 6, 2017, Change Order No. 3 was executed after additional "latent defects" were discovered by Colmex during its work on the Project. Change Order No. 3 increased the Colmex Completion Contract by $111,990.25 bringing the total cost to $1,779,908.85.[153]

---

[149] Stipulated Fact.
[150] Stipulated Fact.
[151] Stipulated Fact; Exhibit 450, G704 Certificate of Substantial Completion dated 3/25/17.
[152] Stipulated Fact "under difference phrasing."
[153] Exhibit 2375, Colmex Change Order No. 3 dated 4/6/17.

(226)   HANO paid Colmex nearly $1.8 Million to complete a Project that was 99 percent complete on June 30, 2016.

(227)   As of the date of trial, the Project had still not reached final completion because DPW has not accepted the work on the Project.

## CONCLUSIONS OF LAW

### Civil Action No. 15-1533: The Principal Action (Parkcrest v. HANO)

(1)     The substantive law of Louisiana applies in this matter.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

(2)     The terms of the Prime Contract and the Takeover Agreement form the law between the parties.  *Corbello v. Iowa Prod.*, 850 So. 2d 686, 693 (La. 2003); *see also Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016) (citing *Barrera v. Ciolino*, 636 So. 2d 218, 222 (La. 1994)).

(3)     Because the terms of the Prime Contract and the Takeover Agreement are clear and unambiguous, Louisiana law requires that they be interpreted according to their terms without further inquiry as to the parties' intent.  *Frischhertz Elec. Co.. Inc. v. Housing Auth. of New Orleans*, 534 So. 2d 1310, 1312 (La. App. 4 Cir. 1988), *writ denied*. 536 So. 2d 1236 (La. 1989); *see also* La. Civ. Code art. 2046.

# I.     <u>The Termination of Parkcrest – April 10, 2015</u>

(4)     The clear and unambiguous language of Clause 32 of the Prime Contract, which provides that Parkcrest's right to proceed shall not be terminated or Parkcrest charged with damages under this clause if the delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of Parkcrest, must be enforced as written. *See e.g.*, *Roger Johnson Const. Co. v. Bossier City*, 330 So. 2d 338, 340 (La. App. 2d Cir. 1976) (applying "[t]o unforeseeable cause beyond the control and without the fault or negligence of the Contractor" as written).

(5)     Because HANO claims the right to terminate Parkcrest, notwithstanding the language of Clause 32 of the Prime Contract, HANO bears the burden of proving that its termination of Parkcrest was proper. *F.H. Paschen, S.N. Nielsen & Assocs., LLC v. Se. Commercial Masonry, Inc.*, 2015 WL 7015389, at *2 (E.D. La. Nov. 12, 2015) (citing *Vignette Publications, Inc. v. Harborview Enterprises, Inc.*, 799 So. 2d 531, 534 (La. App. 4 Cir. 2001)) ("The burden of proof in an action for breach of contract is on the party claiming rights under the contract.").

(6)     Generally, the Court finds Liberty and Parkcrest's witnesses more credible and gives their testimony greater weight than HANO's witnesses. For example, DeHarde and Kennedy repeatedly insisted at trial that HANO was not responsible for a single day of delay despite the fact that even HANO's own internal discussions state otherwise.[154]

---

[154] On July 7, 2014, DeHarde and Kennedy stated in a memorandum that the Project was 21 days behind schedule due to the Entergy delays. *See* Exhibit 2314, Entergy Memorandum dated 7/4/14; *see also* Exhibit 2374, Kennedy email dated June 20, 2014, acknowledging that Parkcrest cannot proceed with its work

Furthermore, at trial Kennedy demonstrated a general lack of knowledge and experience with respect to a construction project of this magnitude and complexity.[155] Stewart, on the other hand, demonstrated a thorough understanding of the events and complicated construction issues at play.[156]

(7)     The Court also gives significant weight to Parkcrest and Liberty's highly qualified expert witnesses in this complex construction litigation.[157]

(8)     Entergy constituted a separate prime contract with HANO as a matter of Louisiana law. *Executive House Building, Inc. v. Demarest*, 248 So. 2d 405, 410 (La. App. 4 Cir. 1971) ("The word 'contractor,' as used in connection with the building trades, means the person who contracts directly with the owner of the property to erect or construct a building or other structure or improvement belonging to the owner.").

(9)     As a result of using two prime contractors – Entergy and Parkcrest – HANO owed Parkcrest an implied duty of cooperation and non-hinderance so that the work between the two of them could be effectively coordinated. 5 Bruner & O'Connor Construction Law §

---

because of the Entergy delays, that this work is critical, and that HANO will incur delay claims if the Entergy does not deliver soon.

[155] At one point during cross-examination, Kennedy was unable to read certain civil infrastructure plans, the accuracy of which were critical to delay issues in this case.

[156] Stewart also testified that he has experience on similar projects and has never not finished a project prior to this one.

[157] The expert witnesses included Jerry Watts, Liberty and Parkcrest's expert architect with a specialty in publically-owned, multi-family housing design and contract administration; Tom Finnegan, Parkcrest's expert in schedule analysis and construction; and Lin Heath, Liberty and Parkcrest's expert and certified cost professional. At trial, the Court excluded the testimony and report of James Brandon English, who HANO offered as a civil and structural engineering expert regarding the project schedule, the coordination of the construction, and substantial completion. The Court determined that there were several problems with allowing Mr. English's testimony including HANO's failure to comply with the Court's Scheduling Order and the fact that Mr. English did not have the expertise to opine on the main issues for which he was being tendered.

15:55 ("The owner's implied duties of cooperation and nonhindrance demand the owner's active and affirmative exercise of its contract rights under all of the prime contracts in order to coordinate and facilitate timely completion of the project."); *see also Nat'l Safe Corp. v. Benedict & Myrick, Inc*., 371 So. 2d 792, 795 (La. 1979) ("[N]ot all obligations arising out of contract need be explicitly stated. Into all contracts, therefore, good faith performance is implied. Furthermore, everything that by equity is considered incidental to the particular contract, or necessary to carry it into effect, is also a part of all agreements.").

(10)     HANO breached this duty by: (1) failing to timely execute the ROW Agreement with Entergy; (2) then giving Entergy longer than Parkcrest's September 14, 2014 completion date to begin and complete Entergy's work; and (3) failing to have Entergy start its work at an earlier time. *Id.*

(11)     HANO's failures with respect to Entergy also caused unforeseen delays to the Project within the meaning of Clause 32 of the Prime Contract that were beyond the control and without the fault or negligence of Parkcrest. *See Katz v. Judice,* 252 So. 2d 532, 538 (La. App. 4 Cir.), *writ denied*, 259 La. 1049, 254 So. 2d 461 (1971) ("In the present case it would appear that the actions of the plaintiff in creating the situation which originally delayed performance on the job . . ."); *Farnsworth v. Sewerage & Water Bd. of New Orleans*, 139 So. 638 (La. 1932) (finding that contractor's delay in completing job of improving drainage pumping station for sewerage board was caused by the board, for which contractor could not be penalized under contract).

(12)     Accordingly, each day of delay to the Project caused by HANO is "excused." *Id.*; *see also Sitman & Burton v. Lindsey*, 48 So. 646, 646 (La. 1908)("Plainly a party cannot

49

claim damages for a default which his own default has caused, or for the nonperformance of a contract with reference to which he himself is in default.").

(13)    The clear and unambiguous language of Clause 32 of the Prime Contract, which provides that delays arising out of acts of HANO and acts of another contractor in the performance of a contract with HANO constitute unforeseeable causes beyond the control and without the fault or negligence of Parkcrest, must be enforced as written. 5 Bruner & O'Connor Construction Law § 15:55 ("Where an owner, by itself or through a construction manager acting as the owner's agent, awards multiple prime contracts for the construction of a project, the owner retains responsibility to coordinate the work of all contractors and, unless otherwise clearly provided in the contract, is liable for delay caused by one contractor to another.").

(14)    Entergy, as a separate contractor in the performance of its contract with HANO, caused unforeseen delays to the Project by (1) delaying the start of its work on the Project, and (2) delaying its design of the Project's electrical infrastructure, within the meaning of Clause 32 of the Prime Contract that were beyond the control and without the fault or negligence of Parkcrest.  *Id.*

(15)    Entergy's delay in supplying temporary power to the Project caused unforeseen delays to the Project within the meaning of Clause 32 of the Prime Contract that were beyond the control and without the fault or negligence of Parkcrest. *See e.g.*, *King Bros. Bldg. Contractors v. McCullen*, 393 So. 2d 413, 415 (La. App. 1 Cir. 1980) (finding that the unavailability of certain material caused delay not the fault of the contractor).

(16) Perez's Contract with HANO obligated it to (1) "prepare and deliver . . . all major elements of the building(s), and site design(s)" on the Project; and (2) "make and independent assessment of the accuracy of the information provided by the Owner concerning existing conditions" for the Project, and these unambiguous terms should be applied as written.

(17) The unambiguous definition of "Architect" in the Prime Contract, which stated that "[t]he Architect shall serve as a technical representative of the Contracting Officer," vested Perez with the authority to act on HANO's behalf, and should be applied as written.

(18) Perez also owed a duty to Parkcrest and Liberty to take reasonable steps to ensure the Project plans and specifications were as accurate as possible. *Standard Roofing Company of New Orleans v. Elliot Construction Co.*, 535 So. 2d 870 (La. App. 1 Cir. 1988), *writ denied*, 537 So.2d 1166, 1167 (La. 1989) ("An architect is deemed to know that his services are for the protection of the owner's interest, as well as the protection of other third parties who have no supervisory power whatsoever and must rely on the architect's expertise in providing adequate supervision, plans, and specifications.").

(19) Perez breached its duty to Parkcrest and Liberty, as the utility tie-ins for the Project were not located where they were depicted on Civil Site Drawings, C3.00 and C3.20, and no evidence has been adduced that Perez took any steps to ensure the accuracy of its plans in this regard despite actual knowledge that the utility tie-ins would likely not be located where Perez had indicated. *See Milton J. Womack, Inc. v. House of Representatives of State*, 509 So. 2d 62, 67 (La. App. 1 Cir. 1987) (architect held liable to general contractor for failing to discover hidden condition at site for inclusion in its plans, despite actual

51

knowledge that the information the accurate had relied upon in producing its plans was likely inaccurate).

(20)    The Project was substantially hindered by the fact that it was not supervised by a qualified architect.  Clayton testified that he was not, and never has been, a licensed architect. The record revealed that Clayton was generally ineffective in his role as Project architect and exacerbated various problems on the Project.[158]

(21)    Accordingly, Perez, as HANO's agent, caused unforeseen delays to the Project within the meaning of Clause 32 of the Prime Contract that were beyond the control and without the fault or negligence of Parkcrest. *Cupit v. Hernandez*, 48 So. 3d 1114, 1119 (La. App. 2d Cir. 2010) ("A contractor is not the guarantor of the sufficiency of plans and specifications drawn by another, and if he complies with those plans and specifications, he is entitled to immunity under La. R.S. 9:2771.").

(22)    At the very least, the differing site conditions as between the utility tie-ins depicted on Civil Site Drawings, C3.00 and C3.20 and their actual location at the Project site caused unforeseen delays to the Project within the meaning of Clause 32 of the Prime Contract that were beyond the control and without the fault or negligence of Parkcrest. *Id.*; *see also Luria*

---

[158] The issues concerning Clayton's performance were also recognized by HANO.  An internal email dated September 4, 2015 revealed that HANO found portions of Perez's work on the Project deficient, stating that the meeting minutes, *inter alia*, were consistently issued at the last minute and lacking in detail, the RFI responses were often incomplete, and "[Clayton] has not had the time to perform reviews of the Work." *See* Exhibit 288.  In a subsequent email dated September 30, 2015, HANO discusses the draft of a letter to Perez requesting that supplemental forces be sent to assist Clayton because "it is obvious that he is often overwhelmed and could use some help." *See* Exhibit 287.

*Bros. & Co. v. U.S.*, 369 F.2d 701 (1966) (low bearing capacity of soils discovered during foundation excavation resulted in delay due to foundation redesign and "trial and error" excavation method by which suitability of soils was verified).

(23)     HANO's agent, ILSI, also caused unforeseen delay to the Project within the meaning of Clause 32 of the Prime Contract in its delayed response to RFI No. 51 that was beyond the control and without the fault or negligence of Parkcrest. *See Popich v. Fid. & Deposit Co. of Md.*, 231 So. 2d 604, 613 (La. App. 4 Cir. 1971) (finding in part that project was delayed as a result of owner's rejection and reorder of certain materials, which was not the fault of the contractor).

(24)     SWB's delay in approval of the revised Civil Site Drawings, C3.00 and C3.20 until September 3, 2014 also caused unforeseen delays to the Project within the meaning of Clause 32 of the Prime Contract that were beyond the control and without the fault or negligence of Parkcrest.  *See e.g.*, *Farnsworth*, 139 So. at 638 (delays caused by sewerage board are not the fault of the contractor).

(25)     To the extent HANO contends the foregoing claims of delay were not properly preserved under the notice provision of Clause 32 of the General Conditions, HANO waived the ability to rely on the notice provision through its consistent actions acknowledging the existence of the foregoing delays.  *Nat Harrison Assocs., Inc. v. Gulf States Utilities Co.*, 491 F.2d 578, 583 (5th Cir. 1974) (citing *Pamper Corporation v. Town of Marksville*, 208 So.2d 715 (La. App. 3d Cir. 1968)) (noting that "a written notice provision in a contract may be waived" in Louisiana where "the consistent actions of the two parties may be found to constitute a 'waiver' of this provision.").

53

(26)     To the extent HANO contends the foregoing claims of delay were not properly preserved under the notice provision of Clause 32 of the General Conditions, such an interpretation of the Prime Contract violates La. Rev. Stat. § 38:2216(H). *See* La. Rev. Stat. § 38:2216(H) ("Any provision contained in a public contract which purports to waive, release, or extinguish the rights of a contractor to recover cost damages, or obtain equitable adjustment, for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void or unenforceable.").

(27)     The clear and unambiguous language of Clause 32 of the Prime Contract, which provides that if after Parkcrest is terminated, it is determined that Parkcrest was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been for convenience, must be enforced as written. *See Parkcrest Builders, LLC v. Hous. Auth. of New Orleans*, No. 16-14118, 2017 WL 3394033, at *3 (E.D. La. Aug. 8, 2017)(applying Clause 32 of the Prime Contract as written).

(28)     Because the delays caused by Entergy on the Project were excusable, Parkcrest was not in default on September 15, 2014 when HANO placed it in default, by operation of Clause 32 of the Prime Contract.

(29)     Because the delays caused by HANO, either directly or through its design professional on the Project were excusable, Parkcrest was not in default on September 15, 2014 when HANO placed it in default, by operation of Clause 32 of the Prime Contract.

(30)     Because the delays caused by SWB on the Project were excusable, Parkcrest was

not in default on September 15, 2014 when HANO placed it in default, by operation of

Clause 32 of the Prime Contract.

(31)     The delayed redesign of the kitchen outlets; delayed installation of the Project's gas

meters by Entergy; and delayed roof vents caused unforeseen delays to the Project within

the meaning of Clause 32 of the Prime Contract that were beyond the control and without

the fault or negligence of Parkcrest.

(32)     In accordance with Clause 32 of the Prime Contract, because the delays to the Project

were excusable (including the delays caused by the delayed redesign of the kitchen outlets;

delayed installation of the Project's gas meters by Entergy; and delayed roof vents on the

Project), Parkcrest was not in default on April 10, 2015 when HANO placed it in default

and terminated it from the Project.

(33)     Because Parkcrest was not actually in default when HANO placed it in default,

Parkcrest's termination must be converted to one for convenience by operation of Clause

32 of the Prime Contract.

(34)     The clear, unambiguous language of Clause 33 of the Prime Contract, which

provides that to the extent that Parkcrest's delay or nonperformance is excused under

another clause in the Prime Contract, liquidated damages shall not be due to HANO, must

be applied as written. *Frischhertz Elec. Co.. Inc.*, 534 So. 2d at 1312; *see also* La. Civ. Code

art. 2046.

(35)  Because Parkcrest's delays were excused under Paragraph 32 of the Prime Contract, HANO is not due liquidated damages stemming from its default of Parkcrest on September 15, 2014, by operation of Clause 33 of the Prime Contract. *See* La. Civ. Code art. 2008 ("An obligor whose failure to perform the principal obligation is justified by a valid excuse is also relieved of liability for stipulated damages.").

(36)  The clear, unambiguous language of Clause 34 of the Prime Contract, which provides that, in the instance of a termination for convenience, HANO is liable to Parkcrest for the reasonable and proper costs resulting from such termination, must be applied as written. *Frischhertz Elec. Co.. Inc.*, 534 So. 2d at 1312; *see also* La. Civ. Code art. 2046.

(37)  As a matter of Louisiana law, Clause 32 of the Prime Contract is void and unenforceable to the extent it waives, releases or extinguishes Parkcrest's delay claims if HANO, or those acting on HANO's behalf, contributed in whole or in part to the claimed delays. *See* La. Rev. Stat. § 38:2216(H) ("Any provision contained in a public contract which purports to waive, release, or extinguish the rights of a contractor to recover cost damages, or obtain equitable adjustment, for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void or unenforceable.").

(38)  As a result of the prohibition against the contractual waiver of claims in La. Rev. Stat. § 38:2216(H), HANO is precluded from asserting that Parkcrest is not entitled to extensions of time or other equitable adjustment for concurrent delays.  Parkcrest may still assert claims for additional time as a result of delays to the Project that were contributed to

in part or in whole by HANO, or those acting on its behalf, notwithstanding the fact that Parkcrest may have contributed to the delay as well.

(39)     Moreover, HANO, as the party seeking to recover delay damages, has an affirmative duty to show that its actions did not constitute a concurrent cause for the delays. *James Construction Group, L.L.C. v. State, Department of Transportation and Development*, 977 So. 2d 989, 995 (La. App. 1 Cir. 2007) ("Our thorough examination of the documentation offered in support of DOTD's motion for partial summary judgment fails to support JCG's assertion that genuine issues of material fact exist as to DOTD's contribution to the delays that occurred in the project.  To the contrary, DOTD's supporting documents establish that the delays for which stipulated damages were assessed against JCG were not attributable to DOTD."); *see also Blinderman Const. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982) (quoting *Coath & Goss, Inc. v. United States*, 101 Ct. Cl. 702, 714–15 (1944); *Commerce International Co. v. United States*, 338 F.2d 81, 90 (1964)) ("Where both parties contribute to the delay 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'").

(40)     HANO cannot carry this burden, as its actions, or the actions of those acting on its behalf, constituted at a minimum, a concurrent cause for the Project delays. *Id.*

(41)     An owner waives its right to reject or is estopped from rejecting any work subsequent to inspection and approval by its representatives. *See e.g., P. Oliver & Son v. Bd. of Com'rs of Lake Charles Harbor and Terminal Dist.*, 148 So. 12 (La. 1933).  Here, HANO and/or its representatives closely monitored, inspected, and approved of Parkcrest's work at various junctures only to subsequently reject the same work later in the Project.

HANO's subsequent rejection of this work led to extreme inefficiencies, delays, and increased costs. HANO hired another contractor (Colmex) to perform much of the same work which HANO initially accepted and then belatedly rejected. HANO may not rely on such work as evidence of a failure to reach substantial completion.

(42)   To the extent any delay to the Project is deemed a concurrent delay, HANO's termination of Parkcrest's right to proceed with the work on April 10, 2015 constituted a breach of the Prime Contract.

(43)   In regards to Parkcrest's claim that HANO is liable to it for the reasonable and proper costs resulting from its wrongful termination as provided in Paragraph 34 of the Prime Contract, Parkcrest has failed to present any evidence to support the existence or amount of those costs. As such, Parkcrest is not entitled to recover any costs as a result of the wrongful termination.

## II.    The Termination of Liberty – June 30, 2016

(44)   Because HANO's termination of Parkcrest was wrongful, a breach of the Prime Contract, and must be considered a termination for convenience, Liberty's performance obligations therefore were not triggered under the Bond. *Pub. Bldg. Auth. of City of Huntsville v. St. Paul Fire & Marine Ins. Co.*, 80 So. 3d 171 (Ala. 2010) (finding that a termination for convenience by the public entity in that case insufficient to trigger the surety's performance bond obligations).

(45)   As a matter of Louisiana law, therefore, HANO is not entitled to damages under the Takeover Agreement, as enforcing its terms under the circumstances presented herein would

constitute an unlawful cause. La. Civ. Code art. 1968 ("The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy.").

(46)     As a result, HANO is not entitled to stipulated damages arising under the Takeover Agreement. La Civ. Code art. 2006 ("Nullity of the principal obligation renders the stipulated damages clause null.").

(47)     Louisiana Revised Statute § 38:2241.1, in turn, defines the meaning of "substantial completion" as "as the finishing of construction, in accordance with the contract documents as modified by any change orders agreed to by the parties, to the extent that the public entity can use or occupy the public works or use or occupy the specified area of the public works for the use for which it was intended." La. R.S. § 38:2241.1

(48)     As a matter of Louisiana law, whether the Project achieved "substantial completion" "is a factual determination to be made by the trial court." *O & M Const., Inc. v. State, Div. of Admin.*, 576 So. 2d 1030, 1035 (La. App. 1 Cir. 1991)).

(49)     The test for substantial completion of the Project under La. Rev. Stat. § 38:2241.1 is whether construction has been completed in accordance with the contract documents to the extent that the Project could be used for its intended purpose as a multi-family residential dwelling.  La. R.S. § 38:2241.1(B).[159]

---

[159] La. R.S. § 38:2241.1(B) provides:

> "Substantial completion" is defined for the purpose of this Chapter, as the finishing of construction, in accordance with the contract documents as modified by any change orders

(50)    Substantial completion can be obtained prior to final completion and does not

require total satisfaction of the contract specifications. *All Seasons Const., Inc. v. Mansfield*

*Hous. Auth.*, 920 So. 2d 413, 416 (La. App. 2d Cir. 2006) (citing *O & M Const., Inc. v.*

*State, Div. of Admin.*, 576 So. 2d 1030, 1035 (La. App. 1 Cir. 1991)) (noting that that

substantial completion "can result even though deficiencies exist." "The extent of the defect

or non-performance, the degree to which the purpose of the contract is defeated, the ease of

correction, and the use or benefit of the work performed to the owner are all factors that

may be considered to determine when substantial completion occurred.").

(51)    Strict adherence with the contract specifications pertains to the final completion

phase; the primary consideration for substantial completion, as it is defined in state law and

generally in the industry, is whether it may be used for its intended purpose.

(52)    In the event of a conflict between the terms of the Prime Contract and Takeover

Agreement, the unambiguous terms of the Takeover Agreement provide that the Takeover

Agreement shall prevail, and these terms should be applied as written. *Frischhertz Elec.*

*Co. Inc.*, 534 So. 2d at 1312; *see also* La. Civ. Code art. 2046.

(53)    As matter of Louisiana law, the Takeover Agreement could not be terminated once

Liberty had achieved substantial completion of the Project. *See* La. Civ. Code art. 2014

---

agreed to by the parties, to the extent that the public entity can use or occupy the public
works or use or occupy the specified area of the public works for the use for which it was
intended. The recordation of an acceptance in accordance with the provisions of this
Section upon substantial completion shall be effective as an acceptance for all purposes
under this Chapter.

La. R.S. § 38:2241.1(B).

("A contract may not be dissolved when the obligor has rendered a substantial part of the performance and the part not rendered does not substantially impair the interest of the obligee.").

(54)     Following the issuance of the Certificates of Occupancy, there was no evidence that any non-code compliant work created a potential life or safety hazard or otherwise prevented the units from being occupied.

(55)     HANO certified to the U.S. Department of Housing and Urban Development ("HUD") that the Date of Full Availability ("DOFA") of the Project was December 31, 2015.  The DOFA is defined under federal regulation as "[t]he last day of the month in which substantially all (95 percent or more) of the units in a public housing project are available for occupancy."[160]

(56)     Building codes are enforced by the Authorities having Jurisdiction - here, the New Orleans Department of Safety and Permits - not by the Owner or Architect.[161]

(57)     The Court finds that the Project was substantially complete as of December 31, 2015, as it could be used for its intended purpose as a multi-family residential dwelling at that time.  The record demonstrates that by December 31, 2015, construction had progressed to the point that the owner could use the Project for its intended purpose.  By December 31, 2015, all 52 units had Certificates of Occupancy and Completion issued by the City.

---

[160] *See* 24 CFR § 905.108.
[161] Exhibit 2323, Watts Report, at 10.  The Department of Safety and Permits, City of New Orleans, is charged with administering and enforcing building code ordinances within the city limits.  Chapter 7, Home Rule Charter of the City of New Orleans.

December 31, 2015 is also the date that DOFA had been reached as represented by HANO and confirmed by HUD. Expert testimony also supports a finding of substantial completion as of December 31, 2015.[162]

(58)     HANO breached the Takeover Agreement when it terminated Liberty from the Project on June 30, 2016 after substantial completion had been achieved. *See* La. Civ. Code art. 2014.

(59)     As a result of HANO's breach of the Takeover Agreement, Liberty's performance thereunder is excused, and HANO is not entitled to recover any damages it contends it incurred to complete the Project after Liberty's termination. *Commerce Ins. Agency, Inc. v. Hogue*, 618 So.2d 1048, 1052 (La. App. 1 Cir. 1993) ("where one party substantially breaches a contract, the other party to it has a defense and an excuse for nonperformance."); *Sitman & Burton v. Lindsey*, 123 La. 53, 54, 48 So. 646, 646 (1908) ("Plainly a party cannot claim damages for a default which his own default has caused, or for the nonperformance of a contract with reference to which he himself is in default.").

(60)     Any delay in completing the Project during the Takeover period was the result of unforeseeable causes beyond the control and without the fault or negligence of Parkcrest/Liberty. *See e.g., E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas*, 551 F.2d 1026, 1042-1043 (5th Cir. 1977), *opinion modified on reh'g*, 559 F.2d 268 (5th Cir. 1977) (designer found liable for delay in rendering interpretation).

---

[162] Watts Report and Finnegan Report.

(61)     Whether directly or through its design professional, HANO's conduct throughout the Takeover period and the Project as a whole - including, *inter alia*, its unreasonable and uncooperative administration of the Project - constituted a prevailing cause of delay to the Project's completion.  For example, the roof vent design issue was first raised in October 2014, but remained unresolved by HANO/Perez until August 13, 2015, some ten months later.  Parkcrest's expert in schedule analysis and construction, Tom Finnegan, noted that Change Order No. 6 gave Parkcrest until mid-November to complete the roof vent redesign work and that Certificates of Occupancy were issued to two-thirds of the units within days of that completion.[163]  The redesign, which required Parkcrest to cut multiple ridge vents into the roofs of all 52 units, was only necessary in order to remedy the roof design errors made by HANO's design team.  Parkcrest had previously installed all 52 roofs based on these faulty design plans; therefore, this belated, remedial work constituted a substantial burden on Parkcrest as it attempted to finish the remaining work on the Project.  HANO was fully aware of the significant scope of work that was required to remedy the design defect. And yet, not only did HANO reject Parkcrest's request to modify the contract completion date after it took over ten months to provide Parkcrest with a solution, but the very next day, on August 14, 2015, HANO placed Liberty/Parkcrest in default.

---

[163] The language of Change Order No. 6 provides that the roof vent redesign work would not prevent HANO from granting substantial completion.  However, it is axiomatic that a roof is a basic and necessary consideration in whether a housing unit is suitable for occupancy and that roofs with holes in them would prevent a finding that the units could be used for their intended purpose.  Expert testimony stated that the roof vent design was required in order to have completed roofs that could be warranted by the roofing manufacturer and that as such, the work was critical to receiving Certificates of Occupancy and substantial completion. Testimony revealed that HANO internally made the decision that regardless of whether or not it obtained certificates of occupancy and regardless of whether or not the buildings are declared to be substantially complete, HANO was not going to put tenants into the buildings until the roof vent redesign work was complete. *See* Adams testimony.

(62)     HANO/Perez's approximate six-month delay between the request by Parkcrest and

Liberty for substantial completion and the provision of punch lists constituted a delay in

completing the work arising from unforeseeable causes beyond the control and without the

fault or negligence of Parkcrest.

(63)     As a result of HANO/Perez's six month delay in providing punch lists for the

Project, HANO is not entitled to liquidated damages encompassing that time.  La. Civ.

Code art. 2008 ("An obligor whose failure to perform the principal obligation is justified

by a valid excuse is also relieved of liability for stipulated damages.").

(64)     The amount of an owner's damages in a claim for breach of construction contract

can be limited to the diminution in value suffered from the defective or non-conforming

work if repairing the defective or non-conforming work would be economically wasteful.

HANO is precluded from seeking recovery of the Colmex Completion Contract sum from

Parkcrest or Liberty.  In light of the minor work remaining when Liberty/Parkcrest were

terminated in June 2016, executing a contract with Colmex was economically wasteful.

(65)     Once the Project was substantially complete, HANO was required to give

Liberty/Parkcrest notice and an opportunity to repair any defective and/or non-conforming

work before hiring a third party completion contractor.[164]   Thus, HANO cannot recover

---

[164] *See* Exhibit 459, General Conditions Section 23(a).  Parkcrest/Liberty warranted "that work performed
under this contract conforms to the contract requirements and is free of any defect in equipment, material, or
workmanship performed by the Contractor." If the warranty is breached, they have a duty to "remedy . . .
failure to conform, or any defect" at their expense.

the amount of the Colmex Completion Contract because it did not provide such notice or an opportunity for Parkcrest to repair the warranty work that it hired Colmex to perform.

(66)   HANO's alleged damages arising from Colmex's work on the Project must be restricted to the amount of any diminution in value that HANO proves it suffered as a result of Parkcrest and/or Liberty's work.

(67)   HANO's refusal to grant substantial completion to Liberty/Parkcrest and its subsequent contract with Colmex was unjustified and economically wasteful. By terminating Liberty/Parkcrest from the Project on June 30, 2016, HANO took a Project that was nearly completely finished and caused approximately four and one-half months of further delay until the rebid process was complete and another contractor remobilized.  In addition to the delay, the rebid and change in contractor greatly increased the cost to final completion, approximately $1.8 million in additional costs and expenses, and yet the Project has still failed to reach final completion to date.  If HANO had instead allowed Parkcrest and Liberty to complete the Project, it would not have cost HANO anything beyond the original contract price.

(68)   HANO bears the burden of proving the existence of all defective and/or non-conforming work as well as the necessity and the cost of all repairs for said defective or non-conforming work once Parkcrest and Liberty prove that the Project was substantially complete.  *Foster v. Jackson*, 339 So. 2d 865 (La. App. 3d Cir. 1976).

(69)   HANO failed to meet its burden of proving the existence, necessity, and cost of any defective and/or non-conforming work after Parkcrest and Liberty established that the

Project was substantially complete by December 31, 2015.  The Court gives very little weight to the testimony of HANO's witnesses who often provided only vague and conclusory statements regarding the cause of the defects, the necessity of the repairs, and their cost.[165]

(70)     During Colmex's completion period, HANO significantly lowered its standard for acceptance of work to complete the Project.  For example, when HANO granted Colmex substantial completion on March 25, 2017, HANO did not require formal DPW acceptance and removed many of the red line items that were required for Parkcrest to obtain substantial completion.

(71)     The unambiguous terms of the Takeover Agreement provide that the prevailing party thereunder is entitled to its reasonable attorney's fees, and that provision must be applied as written.  *Frischhertz Elec. Co. Inc.*, 534 So. 2d at 1312; *see also* La. Civ. Code art. 2046.

(72)     HANO is liable to Liberty for Liberty's reasonable attorney's fees, costs and interest due to HANO's breach of the Takeover Agreement.

(73)     HANO seeks damages for Parkcrest's alleged Section 3/DBE/WBE penalty, which constitutes stipulated damages for nonperformance under Louisiana law.  *See* La. Civ. Code

---

[165] *See infra*, ¶ 83 at pp. 69-70.

art. 2005 ("Parties may stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation.").

(74)   Every contractor working on contracts partially or wholly funded by HUD is required, per HANO's policy, to award ten percent of the contract value to Section 3 enterprises, 20 percent to Disadvantaged Business Enterprises (DBE's), and five percent to Woman Business Enterprises (WBEs).[166] If the contractor fails to meet these minimum standards, then he may be required to contribute two percent of the total contract amount to HANO's Section 3 Training Fund.[167]

(75)   HANO is not entitled to recover any amount of the alleged Section 3/DBE/WBE penalty based upon Parkcrest's full or partial compliance with the requirements among other circumstances.   *See* La. Civ. Code art. 2011 ("Stipulated damages for nonperformance may be reduced in proportion to the benefit derived by the obligee from any partial performance rendered by the obligor."). Jennifer Adams testified that this is the first time that HANO has assessed the full two percent penalty. In one prior instance, HANO reversed its decision to assess the full two percent penalty after a single intervening phone call from the Mayor's Office.[168] Although Parkcrest was approximately 50 percent in compliance, testimony revealed that Parkcrest demonstrated a concerted effort and substantial commitment to complying with the minimum requirements.[169] Parkcrest not only hired a former HANO employee to specifically run its compliance efforts, but

---

[166]  Exhibit 2, at 194.
[167]  Exhibit 2, at 202
[168] Adams testimony.

Parkcrest also held job fairs on the site prior to beginning work on the Project in an effort to hire the requisite subcontractors.[170]

(76)   HANO is not entitled to recover utility payments or additional design services allegedly arising from the delay of Parkcrest or Liberty due to its breaches of the Prime Contract and Takeover Agreement.

(77)   Lin Heath, Liberty and Parkcrest's expert and certified cost professional, opined that $166,596.92 was the value of the remaining work as of Liberty's June 30, 2016 termination based on the scope of the undisputed punch list work.[171]

(78)   Liberty is owed the remaining contract balance at the time Liberty was terminated by HANO on June 30, 2016.  The total contract price ($11,394,172.02) minus the amount HANO paid to date ($10,789,723.50) equals a contract balance of $604,448.52.[172]  From that contract balance, HANO is entitled to an offset of $166,596.92 for the value of the undisputed punch list work that remained incomplete at the time of the June 30, 2016 termination, which yields a total contract balance of $437,851.60 owed to Liberty.

(79)   The Court finds that HANO has failed to establish an accurate or reasonable cost for any defective or non-conforming work performed by Parkcrest.  For instance, the record established that much of HANO's documentation regarding the Project, especially the punchlists and other documents concerning costs, often reflected HANO's attempt to

---

[170] HANO was aware of Parkcrest's efforts and even advertised the job fairs.

[171] Exhibit 2324, Heath Report; *See* Exhibit 454.

[172] Heath initially stated in his report that the amount HANO paid to date through Pay Application 31T was $10,763,763.76.  Subsequent testimony revealed that an additional $25,959.74 had been paid by HANO which lowered the contract balance from $630,408.26 to $604,448.52.  *See* Dominquez and Heath Testimony.

inflate costs and other expenses as much as possible. For example, in an email between Guy Barcelona[173] and Clayton regarding the cost to correct the minor height discrepancies of the handrails, Barcelona directs Clayton to assume that the cost to correct the railings is for all *new* railings, despite the fact that the railings merely needed an adjustment for height. In another instance, despite stating in the ILSI punchlist that *all* of the light poles and light pole bases needed to be replaced for an estimated cost of $227,200.00, Shumann acknowledged that he believed only 16 required removal.[174] Ultimately, not a single one of these light poles or bases were replaced by Colmex, and Shumann still recommended DPW acceptance and HANO accepted the work as substantially complete all the same.[175] Perez's evaluation of incomplete work averaged approximately $27,000 per building. However, according to Watts, a more realistic cost is $3,000 per building. Watts explained that the difference is due to HANO including punchlist items that were completed prior to June 2016 and also to the extremely high values that Perez assigned to the incomplete or "non-conforming" work. The Industry Standard, according to Watts, is two times the estimated value, while here, the assigned cost was in some cases ten times the actual cost to fix the problem.[176]

---

[173] When Kennedy left HANO for another job opportunity beginning in July 2016, Guy Barcelona replaced him as HANO's construction manager on the Project.
[174] Exhibit 436 at bates 5083, Shumann initial punch list.
[175] Shumann testimony.
[176] With respect to the Colmex Completion Contract, testimony revealed that HANO did not require Colmex to verify or document the *actual* cost of the completion/corrective work it performed.

## Civil Action No.: 16-14118 (Ted Hebert v. Parkcrest and Liberty)[177]

## FINDINGS OF FACT

(1)    Ted Hebert, LLC ("Hebert") filed suit against Parkcrest and Liberty for their failure to pay Hebert for work that it performed on the Project prior to Parkcrest's termination on April 10, 2015.

(2)    Turning back to December 2014,[178] the underground infrastructure work was out of sequence, which complicated the work that needed to be completed.  With all of the other utility lines already in place (e.g., electric, gas, cable), the sewage and water work on Congress and Alvar Streets now much more costly, labor-intensive, and time-consuming to perform.  As a result, Durr refused to complete the work.

(3)    Consequently, Parkcrest brought in Ted Hebert, LLC ("Hebert") as a replacement sewer and water subcontractor pursuant to an oral time and materials contract.  Hebert mobilized to begin work on December 10, 2014 and was instructed to furnish and install all sewer and water utilities on Congress and Alvar Street.[179]

(4)    There was no fixed price associated with the oral agreement between Parkcrest and Hebert. There was also no agreed upon time for when invoices had to be submitted by Hebert for payment.

---

[177] At trial, the Court severed Hebert's claims against Parkcrest and Liberty related to the Guste Project. (Rec. Doc. 478.)
[178] *See supra* at 24, the Prime Contract phase.
[179] McKinney testimony.

70

(5)    Parkcrest did not provide Hebert with a time frame or calendar date for which Hebert was to complete the work on Congress Street and Alvar Street either before or during construction.  Given the circumstances, Parkcrest merely requested that the sewer and water work be completed "as soon as possible."[180]

(6)    When Scott McKinney, Hebert's superintendent, arrived on site in December 2014, Stewart provided him with the September 2014 stamped and approved SWB Civil Drawings for Congress and Alvar Streets.[181]

(7)    The updated civil drawings incorrectly identified the underground utility connections on Alvar Street and Congress Street.

(8)    Prior to Parkcrest's termination on April 10, 2015, Hebert was able to complete the installation of the water and sewer utilities on Congress Street and the owner and architect accepted Hebert's work.

(9)    Hebert did not complete the water and sewer utility work on Alvar Street before April 10, 2015 due to various complications stemming from the inaccurate Civil Drawings.

(10)    McKinney testified that for Congress Street, the tie-ins for the sewer lines were not located where depicted, and the location, amount, and size of the water services were likewise incorrect.

---

[180] McKinney testimony.
[181] *See* exhibit 349, Congress and Alvar civil drawings stamped and dated 9/3/14.

(11)     McKinney could not locate the existing sewer main line on Alvar Street as depicted on the Civil Drawings.

(12)     The 2003 as-builts depicted a manhole on the corner of Alvar Street that was not shown on the Civil Drawings provided to McKinney.  McKinney testified that if he had the as-builts at that time and assuming the stubs were located where depicted, Hebert could have completed the work on both streets in a substantially shorter amount of time (approximately 2-4 weeks).

(13)     Compounding the difficulty in locating the utility tie-ins based on the inaccurate Civil Drawings, McKinney testified that whoever originally constructed Alvar Street[182] failed to stamp the curb with certain marks ("W" or "S") that would have identified the location of utility infrastructure tie-ins. These stamps are a DPW requirement.

(14)     McKinney informed Stewart that he found only broken/abandoned sewer pipe at the location depicted by the civil drawings on Alvar Street.

(15)     Ultimately, it was discovered that the sewer line on Alvar was not broken or abandoned.

(16)     To the extent that Parkcrest failed to request CCTV videos during the exploratory digging phase prior to April 10, 2015, the evidence did not demonstrate that such videos would have helped locate the utility tie-ins any faster without accurate drawings.

---

[182] Parkcrest was not the original contractor for Alvar and Congress Streets.

(17)    After discussing the issue with the SWB, McKinney suggested to Stewart that a parallel or "side sewer" line could be installed in lieu of the "broken" main sewer line.

(18)    Stewart authorized McKinney to install the side sewer line outside the servitude and on the property of HANO as long as SWB approved of the plan. SWB subsequently inspected and signed off on the "side sewer" line.

(19)    At the OAC Meeting held on November 14, 2013, HANO informed Parkcrest that HANO did not want SWB lines on HANO property.[183]

(20)    Representatives for HANO, Perez, and/or ILSI were present during Hebert's installation of the side sewer line and did not object until the line was nearly finished.[184]

(21)    HANO and the Professionals of Record issued a notice of defective work to Parkcrest relative to the "side sewer" on the Project on February 25, 2015.[185]

(22)    On March 2, 2015, Parkcrest submitted RFI No. 119 concerning the "side sewer" line and requested information on how to proceed.[186]

(23)    On April 10, 2015, HANO terminated Parkcrest and made demand upon Liberty to complete the Project.

---

[183] Exhibit 1661, Meeting Minutes #34 dated 11/14/13.
[184] McKinney testimony.
[185] Exhibit 802, ILSI Report dated 2/25/15.
[186] Exhibit 799, RFI 119 dated 3/2/15.

(24)     The Notice of Final Default and Termination issued by HANO to Parkcrest on April 10, 2015 in connection with the Project was recorded in the mortgage records for Orleans Parish on April 10, 2015.

(25)     Hebert never returned to the Project after April 10, 2015.

(26)     On April 15, 2015, Hebert provided Parkcrest with all of the invoices for the work performed on Congress Street and Alvar Street totaling $103,193.08.[187]

(27)     Theodule Hebert, IV ("Trey") testified that Hebert was unable to provide receipts on some of this material due its office flooding in 2016, which resulted in the loss of a significant amount of documents.  Trey's testimony further revealed that Hebert has submitted similar invoices to Parkcrest on other projects without any objection from Parkcrest.

(28)     Hebert's 30 percent overhead and 15 percent profit markup is reasonable within the industry.[188]

(29)     Stewart testified that typically, once invoices have been submitted, Hebert would be paid 45 to 60 days after he, HANO, and Perez certified that the work was completed.[189]

(30)     HANO paid Parkcrest and/or Liberty for Hebert's work on the Project.[190]

---

[187] Exhibit 948, Hebert's invoices to Parkcrest dated 4/15/15.
[188] Theodule Hebert III testimony.
[189] Stewart testimony.
[190] Stewart testimony.

(31)     To date, Parkcrest has failed to pay Hebert any of the invoiced amount.  The date of recordation of Hebert's sworn statement of amount due is February 19, 2016.[191]

(32)     On June 13, 2016, Ted Hebert, LLC ("Hebert") filed a state petition against Parkcrest and Liberty seeking payment under the Bond on the Project, plus attorneys' fees and costs.

(33)     At trial, Stewart testified that he would pay Hebert for the water lines that were properly installed on Congress.[192]

## CONCLUSIONS OF LAW

(1)     At the conclusion of Hebert's case-in-chief at trial, Liberty moved for a Rule 52 Judgment on Partial Findings, arguing that Hebert's claims against the bond are prescribed under the Louisiana Public Works Act ("LPWA").[193]

(2)     Louisiana Revised Statute 38:2247 provides, in pertinent part:

> Nothing in this Part shall be construed to deprive any claimant, as defined in this Part and who has complied with the notice and recordation requirements of R.S. 38:2242(B), of his right of action on the bond furnished pursuant to this Part, provided that said **action must be brought against the surety or the contractor or both within one year from the registry of acceptance of the work or of notice of default of the contractor . . . .**

---

[191] Exhibit 949, Hebert Sworn Statement of Amount Due recorded 2/19/16.
[192] Stewart testimony.
[193] The Court took the Rule 52 motion under advisement and ordered briefing on the issue.  *See* Rec. Docs. 485, 487, 492.

La. R.S. § 38:2247 (emphasis added).  Therefore, under La. R.S. § 38:2247 of the LPWA, a subcontractor claimant must assert its claims against a public works surety within one year of recordation of either (1) acceptance of the project or (2) notice of default of the general contractor.

(3)    Liberty argues that the prescriptive period for Hebert's claims provided by La. R.S. § 38:2247 was triggered on April 10, 2015 – the date Parkcrest's default and termination was recorded in the public record – which in turn makes Hebert's lawsuit untimely, as it was filed more than a year from that date on June 13, 2016.

(4)    Hebert argues that La. R.S. § 38:2247 requires claimants to bring suit within one year from either the registry of acceptance of the work or notice of default of the contractor. Hebert contends that it had one year from either Parkcrest's original default on September 15, 2014 or the issuance of the Certificate of Substantial Completion on March 25, 2017.

(5)    Hebert filed its state petition against Parkcrest and Liberty on June 13, 2016. Therefore, Hebert's claim on the bond is prescribed unless March 25, 2017, the date HANO granted substantial completion, is an applicable triggering date for the prescriptive period on Hebert's claim to begin to run.

(6)    This case involves particularly unique circumstances which, at first glance, appear to complicate the prescriptive issue before the Court.  For instance, this case involves multiple notices of default and terminations, an original contractor that was both the General Contractor and then brought back as the Completion Contractor, a surety that took over the Project for the purpose of completion and then was terminated, the same bond

remained in place for both the original contract and the takeover contract, and despite serving as both the General Contractor and the Completion Contractor, the original contractor never completed the Project or obtained substantial completion.

(7)     As noted by the parties, the case law on the applicable statute is exceedingly scarce and there are no cases that have directly addressed the applicable triggering date under these circumstances.   However, despite the complicated facts of this case and the lack of precedent, the provisions of the LPWA must be applied based on the clear statutory language provided.  *See Pierce Foundations, Inc. v. Jaroy Const., Inc.*, 2015-0785 (La. 5/3/16), 190 So. 3d 298, 303 ("When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent.").

(8)     Statutory interpretation commences with the language of the statute and progresses with the assumption that each statutory term has "a particular, non-superfluous meaning." *Bailey v. United States,* 516 U.S. 137, 145–46 (1995); *First Nat'l Bank of Boston v. Beckwith Machin. Co.,* 94–2065 (La. 2/20/95), 650 So. 2d 1148 (noting that courts should give effect to all parts of a statute and not adopt a construction making any part superfluous or meaningless, if that result can be avoided).

(9)      Because the Louisiana Public Works Act is "in derogation of common rights, it is *stricti juris*[,] and liability of a surety may not be expanded beyond the Act." *Martin Marietta Materials of La.*, *Inc.*, *v. U.S. Fid. & Guar. Co.*, 940 So. 2d 152, 156 (La. App. 2d Cir. 2006) (citing La. R.S. § 38:2241(C)).

(10)     Hebert's payment on the bond claim against Liberty is time-barred because March 25, 2017, the date of acceptance, is not the applicable triggering date for Hebert's claim. As a matter of course, an acceptance of work generally occurs *after* a notice of default.  If the facts establish that a notice of default has been entered against the general contractor, then the date of the recordation of that notice of default must be the triggering date for the one-year prescriptive period or else that provision has no purpose.  Hebert's interpretation essentially provides it with the option of choosing the later date, the date of acceptance, as the trigger date for its claims; however, such an interpretation effectively renders the statute's notice of default provision meaningless.  Courts are bound to give effect to all parts of a statute and cannot give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided.  *Langlois v. East Baton Rouge Parish School Bd.*, 99–2007 (La. 5/16/00), 761 So. 2d 504.  Therefore, in order to give meaning to all parts of the applicable statute and to avoid rendering the notice of default provision superfluous, the Court finds that the notice of default is the only applicable triggering date in this case.

(11)     The evidence shows that Hebert had one year from the date of recordation of Parkcrest's final notice of default and termination, April 10, 2015, within which to file its claim.  The Court's conclusion is further supported by the fact that Hebert only performed work on the Project as a subcontractor for Parkcrest.  Moreover, it is undisputed that Hebert performed no work after the April 10, 2015 termination and had no connection with Colmex, the contractor that obtained the Certificate of Substantial Completion.  Therefore, the March 25, 2017 date may not be relied upon for the purposes of extending the time to

file suit. After the default and termination of Parkcrest was properly recorded, Hebert was put on notice that it needed to timely file its claim within one year in order to preserve its claim on the bond. Hebert's payment on the bond claim against Liberty is time-barred, as it was initiated on June 13, 2016, more than a year from April 10, 2015, the trigger date for the one-year prescriptive period of its claim.

(12)     A claim for breach of contract and a claim under the open account statute are considered distinct causes of action. *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 174 (5th Cir. 2007) (citing *Operational Tech. Corp. v. Envtl. Contractors, Inc.,* 665 So. 2d 14, 15 (La. App. 3d Cir. 1995)).

(13)     "The 'time and materials' contract is a form of open-ended cost reimbursement contract under which the contractor is paid merely for furnishing construction resources of labor and materials without significant performance risk. Remuneration is computed (1) on direct labor or equipment hours at specified fixed hourly rates that include wages, direct costs, field overhead, general administrative expenses and profit, and (2) on materials at cost, including, if appropriate, material handling cost as part of material cost." § 2:29. Types of Contracts—Time and materials, and force account, 1 Bruner & O'Connor Construction Law § 2:29.

(14)     Louisiana Revised Statute § 9:2781, Louisiana's Open Account Statute, provides for claims on an open account, in pertinent part, as follows:

> A.     When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant. Citation and

service of a petition shall be deemed written demand for the purpose of this Section. If the claimant and his attorney have expressly agreed that the debtor shall be liable for the claimant's attorney fees in a fixed or determinable amount, the claimant is entitled to that amount when judgment on the claim is rendered in favor of the claimant. Receipt of written demand by the person is not required.

D.      For the purposes of this Section and Code of Civil Procedure Articles 1702 and 4916, "open account" includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. "Open account" shall include debts incurred for professional services, including but not limited to legal and medical services. For the purposes of this Section only, attorney fees shall be paid on open accounts owed to the state.

La. R.S. § 9:2781.

(15)      The Louisiana Supreme Court has cautioned that the open account statute must be construed "strictly . . . because the award of attorney fees is exceptional and penal in nature." *Cong. Square Ltd. P'ship v. Polk*, 10-317, 2011 WL 837144, at *4–5 (E.D. La. Mar. 4, 2011) (citing *Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc.,* 449 So. 2d 1014, 1015 (La. 1984)).  "With this principle in mind, the courts—while acknowledging that an agreement necessarily underlies an open account—have consistently drawn the distinction between open accounts and ordinary contracts." *Id.* (citations omitted).

(16)      Whether an agreement constitutes an open account turns primarily on questions of an agreement's determinacy.  An open account, as opposed to an ordinary contract, generally leaves undetermined key aspects of the obligation such as the time period during which services will be rendered or the total cost of the services for which a party may be liable.  *Wood Materials LLC v. Berkley Ins. Co.*, 17-10955, 2018 WL 560473, at *3 (E.D. La. Jan. 24, 2018); *Ormet Primary Aluminum Corp. v. Ballast Techs., Inc.*, 436 F. App'x.

297, 301 (5th Cir. 2011) ("As the obligation in question constituted an open account because of its undetermined total, and as Ormet has complied with all requirements of the Louisiana Open Accounts Statute, it is entitled to attorneys' fees." ).  Further, as the Fifth Circuit has pointed out, "[a] hallmark of an open account is that [t]he total cost, unlike a contract, is generally left open or undetermined, although the rate for specific services may be fixed, such as an hourly rate." *Ormet Primary*, 436 F. App'x. at 301 (internal quotation marks omitted) (alteration in original); *see also Wood Materials LLC*, 2018 WL 560473 at *3 ("In short, an open account, as its name indicates, is an account that is open to future modification, one that is left open for ongoing debit and credit entries . . . and that has a fluctuating balance until either party finds it convenient to settle and close, at which time there is a single liability.").

(17)     A contract is an agreement embodying "a concurrence in understanding [of] the terms."  *Cong. Square Ltd. P'ship*, 2011 WL 837144 at *4–5 (citations omitted).  While an open account, as its name indicates, is an account that is "open to future modification," one "that is left open for ongoing debit and credit entries . . . and that has a fluctuating balance until either party finds it convenient to settle and close, at which time there is a single liability," *Id*.  "An open account has been compared to a credit account," and a line of credit is an indicium of an open account. *Id.*

(18)     The time and materials agreement between Hebert and Parkcrest constituted an open account.  Testimony established that the sewer and water utility work was to be performed on credit as Hebert expended time, labor, and materials to render professional services.   Also, the total price was an undetermined amount as was the amount of work

and the amount of time that would be required to complete the sewer and water utilities. *See Frey Plumbing Co., Inc. v. Foster*, 07-1091 (La. 2/26/08), 996 So. 2d 969 (finding a plumbing company's suit to recover amount for plumbing and tunneling services constituted a claim on an open account).

(19)    As a general rule, attorney fees are not due and owing a successful litigant unless specifically provided for by contract or by statute.  Louisiana courts construe such statutes strictly because the award of attorney fees is exceptional and penal in nature.  *Accuess Envtl., Inc. v. Walker*, 15-0008 (La. App. 1 Cir. 12/17/15), 185 So. 3d 69, 74.

(20)    Hebert's failure to provide supporting documentation for the invoices it submitted to Parkcrest does not defeat its claim for amounts past due. Testimony revealed that the relevant documentation was lost in a recent flood of Hebert's office.   Additionally, testimony further revealed that Parkcrest raised no issue or complaint of Hebert's lack of supporting documentation in the parties' past course of dealings.   Parkcrest's argument that HANO's involvement distinguishes those past dealings from the situation at hand is unavailing.   HANO has already paid Parkcrest the full amount for Hebert's work. Therefore, Parkcrest may not rely on HANO's more stringent documentation requirements to justify its own refusal to pay Hebert.  There is no real dispute that Hebert expended the time and materials that it has invoiced Parkcrest for on the Project.

(21)    In light of the complications that arose in the sewer work, which could have been prevented if HANO had provided accurate drawings or at least not deliberately withheld relevant documents, the Court finds Parkcrest and Hebert not at fault for the delays associated with the Alvar Street construction.  Although HANO informed Parkcrest in 2013

that it did not want SWB lines on HANO property, the Court also finds that the fact that HANO, Perez, and/or ILSI representatives were present during the installation of the side sewer line on HANO property and failed to object until the line was nearly finished further diminishes Parkcrest/Hebert's culpability for any delay.

(22)     It is clear that the delays related to the sewer and water utility work were not caused by the negligence or mismanagement of Parkcrest or Hebert.  The record demonstrates that Parkcrest and at least three different subcontractors all had great difficulty in completing this portion of the work and that such difficulty was caused by the lack of accurate civil drawings compounded by the complexity and scope of the Project.

(23)     To the extent Hebert was negligent in its performance as the water and sewer subcontractor, Parkcrest is not entitled to damages or an offset because Parkcrest approved of and accepted Hebert's course of action. Also, McKinney's statement that the Alvar Street sewer line was broken/abandoned was an incorrect statement but not an intentional misrepresentation.

(24)     Hebert completed the scope of its work on the Project to the extent that it worked towards completing the sewer and water lines as soon as possible under a time and materials agreement.  The fact that Hebert did not return to the Project to complete the sewer and water lines after termination did not constitute a breach of contract under the terms of the agreement.

(25)     La. R.S. § 9:2781(C) provides: "[I]f the demand is made by citation and service of a petition, the person shall be entitled to pay the account without attorney fees by delivering

payment to the claimant or the claimant's attorney within ten days after service of the petition in city courts and fifteen days after service of the petition in all other courts." La. R.S. § 9:2781(C).

(26) Hebert has complied with the requirements of the Louisiana Open Accounts Statute, as it caused written demand to be made upon Parkcrest, more than 30 days prior to receiving a judgment in its favor.

(27) Because all services rendered and material provided by Hebert were delivered upon an open account and Parkcrest failed to pay on that open account within the applicable time period, in addition to the full amount of the claim, Hebert is entitled to reasonable attorney's fees under the Louisiana Open Accounts Statute for the prosecution and collection of such a claim.

## **CONCLUSION**

Based on the foregoing Findings of Fact and Conclusions of Law,

(1) Parkcrest is not liable to HANO;

(2) Liberty is not liable to HANO;

(3) HANO is liable to Liberty in the amount of $437,851.60 plus reasonable attorney's fees;

(4) Parkcrest is liable to Hebert in the amount of $103,193.08 plus reasonable attorney's fees; and

(5) Liberty's *Rule 52 Judgment on Partial Findings* (**Rec. Doc. 485**) is **GRANTED**. Hebert's claims against Liberty are **DISMISSED with prejudice**.

A court sitting in diversity awards prejudgment interest according to state law, which in Louisiana is the interest rate set out in La. R.S. § 9:3500, but calculates postjudgment interest according to the federal rate, *see* 28 U.S.C. § 1961. Accordingly, the Court awards prejudgment interest at the Louisiana rate and postjudgment interest at the federal rate, from the date of judicial demand until paid.

Within 14 days, the parties shall submit to the Court a proposed form for a final judgment in accordance with these findings and conclusions.

New Orleans, Louisiana, this 8th day of June, 2018.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE